COMMONWEALTH vs. MICHAEL DONAHUE.

Berkshire.  October 8, 1985. — January 21, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Practice, Criminal,* Discovery, Disclosure of evidence in possession of
    Federal authorities.

Discussion of factors bearing on the question whether a State prosecutor is
    obligated to attempt to obtain and produce at a defendant's request
    exculpatory evidence in the possession of Federal authorities. [596-599]
Failure of a prosecutor to attempt to obtain from the Federal Bureau of Inves-
    tigation, and produce at a defendant's request, certain material and
    exculpatory evidence, consisting of transcribed reports of interviews
    with a potential alibi witness who was in the Federal Witness Protection
    Program, necessitated the granting of the defendant's motion for a new
    trial on a charge of armed robbery, where, if the reports had been in
    the possession of State authorities the defendant would have been entitled
    to them under State law or if the prosecution had been in the Federal
    system he would have been entitled to them under Federal law; where
    the defendant had unsuccessfully sought on his own to obtain the reports
    from Federal authorities; and where the circumstances showed sufficient
    cooperation between State and Federal prosecutors that the prosecution
    would not have been burdened by being required to forward the defend-
    ant's request to the F.B.I. [599-602]
In the circumstances, a criminal defendant who had requested a prosecutor
    to obtain certain investigative reports from Federal authorities was not
    required to obtain a court order directing the prosecutor to seek this
    material, where the prosecutor had given the defendant no indication
    that he would not do so in the absence of a court order. [600-601]

COMPLAINT received in the Pittsfield Division of the District
Court Department on July 21, 1979.

The case was tried before *Kent B. Smith,* J., and a motion
for a new trial was heard by *William W. Simons,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*David Kelston (Gail Strassfeld* with him) for the defendant.

*Robert J. Carnes,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. On June 25, 1979, three men robbed a branch of the Berkshire Bank and Trust Company in Pittsfield. Following a jury trial, the defendant was found guilty of armed robbery while masked and sentenced to life imprisonment for his participation in the robbery. The defendant timely filed a notice of appeal. Approximately a year after his conviction, the defendant filed a motion for new trial, based on the prosecutor's failure to obtain and produce on request exculpatory evidence held by the Federal Bureau of Investigation (F.B.I.). Following a hearing, a judge of the Superior Court denied the motion for new trial. The defendant filed a notice of appeal from that denial. The appeals from the original trial and from the denial of the motion for new trial were consolidated in the Appeals Court. We transferred the case here on our own motion.

The defendant raises two issues on appeal. First, the defendant argues that the motion judge erred in concluding that the prosecutor was not obliged to obtain material and exculpatory evidence in the possession of the F.B.I. and to provide the evidence to him prior to trial. Second, the defendant argues that he was prejudiced by the prosecutor's closing argument to the jury.[1] We conclude that the defendant was denied a fair trial by the unavailability of material and exculpatory evidence and that a new trial must be ordered. Because we order a new trial on this ground, we do not consider the propriety of the prosecutor's closing argument.[2]

*The Commonwealth's case.* In order to place in perspective the facts surrounding the undisclosed evidence, we first review the Commonwealth's case as it may have appeared to the jury. On June 25, 1979, around 11:00 A.M., three men disguised with wigs, beards, and hats robbed the Allendale branch of the Berkshire Bank and Trust Company, taking $259,710.90.

---

[1] Appellate counsel for the Commonwealth was not the prosecutor.

[2] Appellate counsel for the defendant was not trial counsel. We note that only one of the alleged improprieties now argued by the defendant properly was preserved on appeal by a timely objection to the trial judge.

At least one of the men was armed. The three men ran out of the bank and entered a tan station wagon. Shortly thereafter, they switched to a red Oldsmobile automobile. Both vehicles were found. From the tan getaway car, the police recovered a laundry bag with about $11,000 in it, some of which was "bait" money taken from the bank. In the Oldsmobile, the police found eyeglasses, a hat, a wig, other clothes, and some personal papers.

At trial, the Commonwealth's theory was that the defendant robbed the bank with two other men, Ralph Petrozziello and Kenneth Wightman. Several witnesses testified about the presence in Berkshire County in late June, before the robbery, of a group of persons that included, at different times, the defendant, Petrozziello, Wightman, and two others. Only two of the five witnesses so testifying were able to identify the defendant; one witness testified that she had seen the defendant washing a red Oldsmobile. Two bank employees identified the defendant as a person they might have seen at the bank at some time before the robbery, but were not able to identify the defendant as one of the robbers. Four bank employees identified Petrozziello as one of the robbers. Another witness testified to seeing the robbers leave the bank and identified the defendant as the driver of the getaway car. The witness stated that he and the defendant had looked at each other for a period of thirty to forty seconds from a distance of twenty to forty feet. The witness testified that all he could see at the time of the robbery was the suspect's nose and part of his cheek. He testified that a month after the robbery he had picked the defendant's photograph out of an array solely on the basis of his "odd . . . real flat" nose.

The remaining evidence linking the defendant to the robbery was provided by one Ronald Gates, who was with the defendant in jail while the defendant awaited trial. Gates testified that the defendant admitted to him, in the presence of two other inmates, that he robbed the bank. The defense called these other two inmates to the stand, and both denied Gates's story. Another inmate testified that the defendant and Gates stayed away from each other.

*The missing alibi evidence.* Prior to trial the defendant informed the district attorney that he intended to offer an alibi defense that he was in a cabin in the Berkshires while the bank robbery in question was being committed. The defendant said that Rita Haggerty and Deborah Sperrazza would support his alibi. Defense counsel was unable to locate Haggerty, but did learn that Sperrazza was in the Federal Witness Protection Program. Upon the allowance of the defendant's motion for the physical production of a witness, the assistant district attorney telephoned the United States Attorney in Springfield and obtained his assistance in producing Sperrazza. In September, 1980, shortly before trial, United States marshals brought Sperrazza to the district attorney's office in Pittsfield. She refused to speak with defense counsel, but did talk with the assistant district attorney. She told him that she and the defendant had come to Berkshire County to rob a bank. They checked escape routes, and the defendant stole a police radio scanner from a local store. Sperrazza also stated that on the morning of the robbery, she was in a cottage in Lanesboro with the defendant, Petrozziello, and Wightman. She said that she was asleep up to the time when Red Halliday came to the cottage with the information that the bank had been robbed. In response to questioning, she said that she could not say whether the defendant was present at the cottage at all times before she awoke. The assistant district attorney promptly informed defense counsel of these statements. Defense counsel concluded that Sperrazza's testimony would not be helpful at trial and that she should not be called as a witness.

Before trial, the defendant also subpoenaed F.B.I. Agent Joseph Adams, requiring him to produce all records of his investigation of the bank robbery. On the morning of trial, Adams met defense counsel at the courthouse. He refused to divulge the contents of his investigative file, but did inform defense counsel that he had nothing which would "help you" in connection with the defense.

About a year after the defendant's conviction, he learned that, before his trial, Sperrazza had given a statement to the

F.B.I. that exculpated him.[3] The defendant thereupon moved for a new trial on the basis of the suppression of the report of that interview. At the hearing on the motion, the F.B.I. produced a report of a second interview with Sperrazza.

The motion judge found that in November, 1979, the F.B.I. twice interviewed Sperrazza and made transcribed reports ("302 reports") of the interviews. Relevant portions of the reports dated November 5, 1979,[4] and November 21, 1979,[5]

----

[3] The report of Sperrazza's statement was sent to defense counsel by another attorney who had received the report from the Commonwealth in the course of pretrial discovery in an unrelated case involving another individual named by Sperrazza in her statement.

[4] "DEBBIE SPERRAZZA was interviewed at the United States Marshal's Office, McCormack Post Office and Courthouse, Boston, Massachusetts. . . .

"SPERRAZZA advised that with regard to RALPH PETROZZIELLO and KENNY WIGHTMAN, she did not know their current whereabouts. She stated that in June, 1979, RITA HAGGERTY FITZGERALD asked her if she wanted to go on a vacation trip to the Berkshires. She stated that they drove to a cottage in Lanesboro, Massachusetts, which is in the Pittsfield area. She advised that this cottage had been rented by RITA HAYS and that when they arrived, present at the cottage were RITA HAYS, RALPH PETROZZIELLO, KENNY WIGHTMAN and MICHAEL DONAHUE.

"SPERRAZZA advised that nothing was said, but she realized that something, some score, was being planned. She stated that she and MICHAEL DONAHUE went to a Radio Shack in the area and that MICHAEL DONAHUE stole a $400 scanner. She advised that one day, everyone was sitting around and the scanner was on. She advised that they heard on the scanner that a bank in Pittsfield had just been robbed. She stated that PETROZZIELLO, WIGHTMAN and DONAHUE were very upset about this. She further stated that she heard that they had been charged with this robbery. . . ."

[5] "DEBBIE SPERRAZZA furnished the following information regarding the robbery of the Berkshire Bank and Trust Company in Pittsfield, Massachusetts, on June 25, 1979:

"She does not feel that the bank was robbed by RALPH PETROZZIELLO, MICHAEL DONAHUE and KENNY WIGHTMAN because she was with these people at a cottage in Lanesboro, Massachusetts at the time the bank robbery was committed. She first heard about the bank robbery from RED HALLIDAY. RED came to the cottage on Bena Street in Lanesboro where they were staying on the morning of the robbery and told them that the robbery had occurred and that they should stay inside.

"On the morning of the robbery she was up from bed before WIGHTMAN, PETROZZIELLO or DONAHUE and none of them left the cottage until

are set out in the margin. The statements were similar to the
ones Sperrazza was to give ten months later, but differed in
several important respects. Sperrazza stated that on the morning
of the robbery, she was the first out of bed before the defendant,
Wightman, and Petrozziello.[6] She also reported that upon learn-
ing of the robbery, the three men were very "upset" and that
immediately after the robbery, the defendant had no money.

The motion judge found that the 302 reports containing
Sperrazza's statements were material and exculpatory: "In es-
sence, the alibi to be offered the jury would be that while the
defendant was contemplating and preparing a robbery of the
bank, someone else beat him to it." The judge also found that
the prosecutor "made a full and complete disclosure of all
exculpatory evidence that was in the possession and custody
of its office and the existence of which was known to the
Commonwealth at all relevant times up to and including the
trial of the defendant," but that the district attorney's office

---

after they had heard about the bank robbery.

"After RED informed them about the bank robbery, RITA HAGGERTY
turned on the police scanner that they had at the cottage and listened to
police transmissions regarding the robbery. Despite RED's suggestion not
to go outside, both MICHAEL DONAHUE and KENNY WIGHTMAN
went out.

    ". . . .

"Other than KENNY WIGHTMAN and DONAHUE going out that day,
most of the others stayed inside the cottage.

    ". . . .

"She knows that immediately after the robbery and all the time she was
with him, MICHAEL DONAHUE was broke. She knows this because
MICHAEL was asking RALPH for money.

    ". . . .

"One day when they were at the cottage, they were riding around in
Lenox, Massachusetts. On that day she, the two RITAS [HAYS and HAG-
GERTY], MICHAEL DONAHUE, KENNY WIGHTMAN and RALPH
went into a Radio Shack store in Lenox. She and the other two girls looked
around in one part of the store and RALPH and KENNY engaged the
manager in conversation in the rear of the store. While they did this,
MICHAEL DONAHUE took a scanner from the shelf by the front door,
put it under his coat and walked out of the store."

[6] In her later statement to the assistant district attorney, Sperrazza indicated
that "she didn't know" whether the defendant could have left the cottage
and returned before she awoke. Because this later statement does not re-
pudiate the statements in the F.B.I. 302 reports, we treat the 302 reports
as substantive evidence.

had no knowledge of the F.B.I. interviews with Sperrazza until the defendant filed his postconviction motion for a new trial.

*Discussion.* "Ordinarily the prosecutor's obligation to disclose information is limited to that in the possession of the prosecutor or police." *Commonwealth* v. *Liebman,* 379 Mass. 671, 675 (1980) (*Liebman I*), citing *Commonwealth* v. *Campbell,* 378 Mass. 680, 702 (1979). This rule follows from *Brady* v. *Maryland,* 373 U.S. 83 (1963), where the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The prosecutor cannot be said to suppress that which is not in his possession or subject to his control. Because the prosecutor apparently had no control over the F.B.I. 302 reports, it has not been shown that he suppressed them and, thus, the first requirement for proving a *Brady* violation has not been established here. *Commonwealth* v. *Liebman,* 388 Mass. 483, 487 (1983) (*Liebman II*).

Nevertheless, the motion judge found that the evidence was material and exculpatory.[7] Moreover, it is clear that, if the 302

[7] At oral argument, the Commonwealth conceded that the evidence was exculpatory, and accepted the motion judge's findings as to materiality, with the reservations expressed by the judge. We understand the Commonwealth's reference to "reservations" as pertaining to the following findings of the judge: "While it is clear that the information contained in the F.B.I. 302 Reports concerning the Deborah Sperrazza interviews are material and exculpatory in that they would tend to provide a potential alibi defense to the defendant, it cannot be ignored that it is equally clear that the evidence could be adduced only at great peril to the defendant since Ms. Sperrazza was in the Witness Protection Program at the time of the trial, had clearly indicated, both in her statement and in her conversations with the District Attorney that the defendant was in the area for the purpose of robbing the bank. In essence, the alibi to be offered the jury would be that while the defendant was contemplating and preparing a robbery of the bank, someone else beat him to it." As we discuss, *infra,* it is inappropriate for a judge to assume the role of counsel and determine whether and how to offer particular evidence. Likewise, it is inappropriate for a judge to assume the role of the jury and pass on the credibility of the witness and her story. In expressing his "reservations," the motion judge did not, we believe, intend to assume the role of either counsel or jury. Nor do those "reservations" contradict his basic finding that the evidence was material.

reports had been in the possession of State authorities, the defendant would have been entitled to them under our law; if the prosecution had been in the Federal system, the defendant would have been entitled to the reports under Federal law. See, e.g., *United States* v. *Gaston,* 608 F.2d 607, 612-614 (5th Cir. 1979); *United States* v. *Bryant,* 439 F.2d 642, 650 (D.C. Cir. 1971). As we noted in *Liebman I,* the "introduction of two sovereignties creates a potentiality for unfairness which would need correction if realized in practice." *Id.* at 674. In *Liebman I,* we held that such unfairness should be avoided by "assimilation of State and Federal proceedings." *Id.* Thus, the precise issue presented here is whether, in the circumstances of this case, the principles of *Commonwealth* v. *Liebman I* and *II* oblige the prosecutor to try to obtain material and exculpatory evidence in the possession of the F.B.I. The principles and policies underlying *Brady* are useful guides for our analysis. See *Liebman II, supra* at 487.

*Brady* mandates some cooperation by the prosecutor with defense counsel in the interests of a fair trial, but the departure from a pure adversary model is limited. *United States* v. *Bagley,* 473 U.S. 667, 675 n.6 (1985). The prosecutor is not expected to investigate all exculpatory evidence that may exist, *Commonwealth* v. *Stone,* 366 Mass. 506, 511 (1974); to produce exculpatory evidence held by government agencies other than the prosecutor and police, *Commonwealth* v. *Campbell, supra*; or to give discovery of every aspect of his case, *Commonwealth* v. *Adrey,* 376 Mass. 747, 754 (1978); *Weatherford* v. *Bursey,* 429 U.S. 545, 559-561 (1977). Thus, the *Brady* rule is tempered by continued adherence to the adversary system as a means of discovering the truth and by the practical concern that the prosecutor not be so burdened that the administration of justice is unduly hampered. For these reasons, a showing that Federal authorities held material and exculpatory evidence *without more* is insufficient to justify a departure from the general rule limiting the prosecutor's obligation to disclose to evidence in the possession of the Commonwealth at the time of trial. *Commonwealth* v. *Gilday,* 382 Mass. 166, 174 (1980).

We have recognized, however, that, in some circumstances, the prosecutor should be required to seek access to material and exculpatory evidence. See *Liebman I, supra.* In *Liebman I,* the defendant sought access to the minutes of Federal grand jury testimony that allegedly contained exculpatory evidence. He had been unsuccessful in petitioning the Federal courts for an order granting access to the minutes. Had the grand jury been a State grand jury, or had the prosecution been brought in a Federal court, the defendant would have been entitled to the material he sought. *Id.* at 674. We held that, when the defendant successfully moves in State court for production of Federal grand jury minutes, the cooperative relationship between State and Federal prosecutors and the existence of Federal precedent for ordering the release of grand jury minutes in connection with State proceedings justified placing on the State prosecutor the burden of securing Federal cooperation. *Id.* at 675. Thus, in *Liebman I,* a strong potentiality of unfairness to the defendant, the defendant's inability otherwise to obtain the evidence in question, and the relatively light burden on the prosecutor weighed in favor of placing the responsibility on the prosecutor. When the potentiality for unfairness in fact was realized, we determined that the defendant should be afforded a new trial. *Liebman II, supra* at 486-490.

Similar considerations have arisen in cases involving the failure of State prosecutors to obtain on request the F.B.I. "rap sheets" (records of prior convictions) of victims and witnesses. See *Briggs* v. *Raines,* 652 F.2d 862, 865 (9th Cir. 1981); *Martinez* v. *Wainwright,* 621 F.2d 184, 187 (5th Cir. 1980); *State* v. *Ireland,* 11 Or. App. 264, 268 (1972). The courts in those cases appear to have been influenced by the fact that F.B.I. rap sheets are unavailable to defense counsel directly but are available to local police as a matter of course. "FBI rap sheets are in the constructive possession of the state in almost every case." *Briggs* v. *Raines, supra* at 865, quoting *State* v. *Ireland, supra* at 268. See *Martinez* v. *Wainwright, supra* at 185 n.2 & 187.

The degree of cooperation between Federal and State investigators on a particular case has also been an important factor

in determining the prosecutor's obligations. In *United States* v. *Antone,* 603 F.2d 566 (5th Cir. 1979), that court found that, where State and Federal investigators had cooperated extensively, the State investigators functioned as agents of the Federal government and that their knowledge of the perjury of the government's principal witness should be imputed to the Federal prosecutors. *Id.* at 570. Similarly, in *Commonwealth* v. *Manning,* 373 Mass. 438 (1977), we held that the misconduct of a Federal agent working in close cooperation with State investigators had interfered with the defendant's right to counsel and therefore required dismissal of the State indictment.

In summary, the *Liebman* cases and similar cases suggest that the following factors are important in determining whether the prosecutor is obligated to seek requested exculpatory evidence from Federal authorities: the potential unfairness to the defendant; the defendant's lack of access to the evidence; the burden on the prosecutor of obtaining the evidence; and the degree of cooperation between State and Federal authorities, both in general and in the particular case.

Following the principles of *Liebman I* and *II,* we believe that in this case the prosecutor was obliged at least to request the F.B.I. to forward any material, exculpatory evidence in its possession. The same unfairness that existed in *Liebman II* is present here. The 302 reports would have been available to the defendant if the prosecutor or local police had physical possession of them, or if the defendant had been prosecuted in the Federal system.[8] The defendant unsuccessfully attempted to obtain the reports on his own.[9] The defendant subpoenaed the

[8] Federal prosecutors presented evidence to a Federal grand jury in connection with the bank robbery. On establishing that the Pittsfield authorities were proceeding with prosecution of the defendant, the Federal prosecutors elected not to proceed with their prosecution of the defendant.

[9] The defendant specifically requested exculpatory F.B.I. reports, but did not specifically request materials relating to Sperrazza. The specificity of the request is an important factor in determining the standard of materiality to be applied in reviewing the evidence. See *United States* v. *Bagley,* 473 U.S. 667 (1985); *United States* v. *Agurs,* 427 U.S. 97 (1976). In this case, we need not characterize the degree of specificity of the defendant's request or consider what standard of materiality should be applied, either as

files of the F.B.I. agent who worked on the bank robbery. The agent, though refusing to honor the subpoena, told defense counsel that he did not have any exculpatory information in his files anyway. In addition, the defendant was unable to locate Sperrazza to interview her during most of the pretrial period because she was in the Federal Witness Protection Program. Once Sperrazza was located, some ten months after the interviews, she refused to speak with defense counsel.

By contrast, the 302 reports may well have been available to the prosecutor on request. The first of the two reports in fact came to light in the course of discovery of another Commonwealth criminal prosecution,[10] and the F.B.I. voluntarily produced the second report at the hearing on the motion for new trial.

We have noted that the motion judge found the cooperation between Federal and State investigators in this case to have been limited. Thus, there is no ground for imputing the F.B.I.'s knowledge or for attributing the apparent misrepresentations of the F.B.I. agent to the Commonwealth. However, "cooperation between State and Federal prosecutors is and should be common enough," *Liebman I, supra* at 675, so that a State prosecutor would not be unduly burdened by passing on to the appropriate Federal authorities a defense request for exculpatory materials held by the F.B.I. At least in the circumstances presented here, where Federal authorities also investigated the case and a key witness is in the Federal Witness Protection Program, the prosecutor should have forwarded the request.

That burden is not relieved in this case by the absence of a court order directing the prosecutor to produce the F.B.I. reports. Soon after his arrest, the defendant specifically requested the prosecutor to obtain F.B.I. reports. The prosecutor made a complete disclosure of all exculpatory information in his possession; however, he neither asked the F.B.I. or the United

a matter of Federal or Commonwealth constitutional requirements. By any standard, the evidence is material because, if believed, it is a complete defense.

[10] See note 3, *supra*.

States Attorney for such information, nor apparently did he indicate to defense counsel that he would not do so in the absence of a court order. The prosecutor's cooperation made it unnecessary for the defendant to insist on a court order. In these circumstances, the defendant should not be penalized for failure to obtain a court order.[11] However, in view of the absence of a court order and the limited cooperation between State and Federal law enforcement authorities in this case, the prosecutor's only responsibility was to pass the request along to the appropriate Federal officials and to transmit the Federal response to counsel. Or, if he had a good faith reason for refusing to do so, the prosecutor should have so informed the defendant, so that he could seek a court order.[12] We need not speculate on the further responsibilities, if any, the prosecutor may have had if the Federal authorities had declined to cooperate.[13]

Finally, we reiterate that the motion judge found the 302 reports to be both exculpatory and material. From the record, it appears that the Commonwealth's theory of the case was that the defendant robbed the bank with Wightman and Petrozziello. Much of the evidence pointed to Wightman's and Petrozziello's whereabouts before the robbery and to identification of Petrozziello as one of the robbers.[14] Had the 302 reports

---

[11] The Commonwealth's argument implies that the defendant's failure to mark up and argue his motion for discovery is significant. We disagree. In view of the prosecutor's apparent cooperation with defense counsel on discovery, defense counsel cannot be faulted if he believed that no court order was necessary. If we were to require a court order in such circumstances, prudent defense counsel would be encouraged to argue all discovery motions, regardless of the prosecutor's apparent cooperation. That would undermine the voluntariness on which the smooth functioning of the pretrial discovery rules depends, and unnecessarily burden the courts by requiring hearings on all motions.

[12] The prosecutor may be justified in refusing a request where the factors of potential unfairness to the defendant, the defendant's lack of access to the evidence, relatively minimal burden on the prosecutor, and cooperation between State and Federal authorities are not present.

[13] Nothing in this opinion is meant to suggest that Federal authorities should be obliged to respond differently to requests for exculpatory materials in a State proceeding than to similar requests in a Federal proceeding.

[14] Subsequent to the trial in this case, Petrozziello was tried and acquitted on charges stemming from the bank robbery.

been timely provided to the defendant, he may have chosen to call Sperrazza as a witness to construct the alibi defense that he did in fact come to Berkshire County with Wightman and Petrozziello to rob a bank, but that somebody else beat them to it. Such an alibi would have been consistent with the Commonwealth's evidence linking the three men together before the robbery and with the identification of the defendant by two tellers as someone they might have seen in the bank before the robbery. Most importantly, that alibi would have been material because, if believed, it would have been a complete defense. Although we find it difficult to disagree with the motion judge that such an alibi might have been dangerous to use at trial, the decision whether or not to offer that alibi was a strategic one for defense counsel and the defendant to make. It is inappropriate for a judge on a motion for new trial to assume the role of counsel and determine whether and to what use particular evidence should have been introduced, or to assume the role of the jury and pass on the credibility of a witness and her story. *Liebman II* at 489.

*Conclusion.* On the defendant's specific request for exculpatory materials in the possession of the F.B.I., the prosecutor was obliged either to seek the cooperation of the appropriate Federal authorities or, if he had a good faith reason for refusing to do so, to inform the defendant of that refusal. Because the prosecutor's failure to take either of these steps denied the defendant access to material and exculpatory evidence, the defendant is entitled to a new trial.

The judgment is reversed, the verdict set aside, and the case is remanded to the Superior Court for a new trial. The order denying the motion for a new trial is reversed.

*So ordered.*