In Re Rushford, No. S0290-03 Cncv (Katz, J., July 22, 2005)


[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


STATE OF VERMONT
Chittenden County, ss.:


IN RE RUSHFORD


ENTRY


Petitioner, a former Corrections officer, has been convicted of sexually assaulting two female inmates. He now seeks to overturn his conviction and sentence through Post-Conviction Relief, 13 V.S.A. § 7031, because of allegedly suppressed evidence and ineffective assistance of counsel. Petitioner has filed for summary judgment on all of his claims. The State opposes Petitioner's motion and has also filed for summary

judgment.

## Factual Background

In 1999, Petitioner became a temporary corrections officer with the Department of Corrections at the Chittenden Correctional Center in South Burlington. On October 31, Corrections assigned Petitioner as the substitute guard for the W-A and W-C sections in the women's wing of the Chittenden facility. Section W-A housed fourteen to seventeen female inmates on a permanent basis while section W-C was reserved for temporary custody or inmate isolation. Among the females housed in W-A were inmates Benjamin and Young, Petitioner's future accusers. At trial, the accusers testified that the petitioner came into their room, smoked a cigarette with them—in violation of the facility's regulations—and grabbed their breasts. At trial, Petitioner denied this version of events and claimed that Benjamin and Young, in fact, performed oral sex on him at that time.

Following this encounter in Young's cell, Petitioner began lock-down procedures for the night. He then sent Young to clean up a mess in W-C, which was, for the most part, unoccupied. Young, being six months pregnant at the time, enlisted Benjamin to help her. Shortly thereafter, the petitioner joined them in W-C and, as the inmates testified, grabbed them and forced both of them to have oral sex with him and Young to have vaginal sex. Again, Petitioner admitted to the sex but asserted at trial that it was initiated by Benjamin and Young.

Following the sexual acts, the two inmates finished their cleaning duties and returned to their cells. When petitioner was relieved by another officer, Benjamin requested to see a nurse. Benjamin and Young were examined and treated by an on-duty nurse in the facility who sent them for

further examination at an off-site hospital.  The hospital confirmed the evidence of ejaculation on Benjamin and sexual penetration on Young. Corrections immediately suspended petitioner that night.  An investigation began the next day headed up by officers from the Chittenden Unit for Special Investigations, a police task force assigned to investigate sexual assault cases.  From that morning of November 1 onward, these were the investigators who collected evidence, prepared witnesses, and worked directly with the State's Attorney in building the case against Petitioner.

Once charged in District Court, Petitioner was represented by Attorney Robert Andres.  For the next few months, Andres attended several pre-trial conferences involving Petitioner's case.  On at least one occasion, he failed to notify petitioner of such a conference.  At several other conferences, Andres spoke to the court of his plan and intent to depose the two accusers before trial.  He never did this.  By the time of trial, however, he secured Benjamin's criminal record as well as the reports and transcripts of the Special Unit's investigation into the case.  He never reviewed these or any other documents with Petitioner.  It also does not appear that Andres made any efforts to negotiate or secure a plea agreement.

On May 25, 2000, Petitioner's trial began.  While the State called the Special Unit investigator, the nurse who treated Benjamin and Young, and Petitioner's supervisor, its case revolved primarily around the testimony of Benjamin and Young in order to establish that the sexual contact was non-consensual.  Although Andres cross-examined the State's witnesses at some length about the consistency of their testimony, he did not introduce evidence about the accusers' criminal record or otherwise attempt to impeach them.

At the end of the State's case, the presiding judge observed, "[The

State's] made a prima facie case. It's just a credibility contest here." (Trial Transcript, at 307, May 25, 2000.)   Andres conducted the defense case by calling Petitioner as its sole witness. Petitioner claims that Andres did not prepare him in any way to testify and did not, in fact, tell Petitioner until that morning that he planned to put Petitioner on as a witness. Andres, through an affidavit filed by the State, disputes this and claims that he had extensive conversations with Petitioner about testifying and prepared him for the basics of cross-examination. Andres's files, however, show no record, notes, or reference whatsoever to any such conversations or contacts.

On direct, Petitioner testified briefly about his version of the events. This examination established Petitioner's version of events but did not go into any detail or develop his testimony. On cross examination, the State did go into details about the events and Petitioner's poise and delivery held up poorly. Petitioner became lost in references to prior statements and questions regarding the exact order of events. He stumbled, stuttered, and became nervous as the State asked him detailed questions about the sexual contacts and his version of the accusers' consent. This  poor performance by Petitioner seems to have done more to harm his credibility than anything else. An attempt at re-direct does not appear to have had an rehabilitative effect. The jury soon returned a guilty verdict on two of the three counts of sexual assault. After a change of counsel, petitioner was sentenced on November 14, 2000 for seventeen to forty years. He filed a motion for a new trial. It was denied, and petitioner filed an appeal the next day.

Less than a month before petitioner's trial, the Department of Corrections received a letter from an inmate who claimed to be the ex-boyfriend of Young. In this letter, Kent Reed claimed to have information about a plan Young had made prior to her incarceration to frame an officer

for sexual assault. In return for his information and his cooperation, Reed asked that he be returned to Vermont for the rest of his sentence. Reed sent additional letters about this issue to the Department on June 13 and June 22. The letters state that Young planned to seduce a Corrections officer and then "cry rape" as a way of getting back at the system by filing a civil action for damages. None of the letters name either Petitioner or Young's co-accuser, Benjamin. By June 27, 2000, a month after trial, these letters went to legal counsel at Corrections, who investigated their veracity. After completing its investigation, Corrections released the letters to the State's Attorney's office in September 2001. Ten days after receiving the letters, the State's Attorney notified Petitioner of the Reed letters and sent a copy of Correction's investigation.

## Legal Analysis

Petitioner's post conviction relief claims fall into one of two categories. The first include claims surrounding the discovery of the Reed letters, their potential suppression, and an accompanying duty to disclose. This requires what is known as a Brady analysis to determine whether there was a suppression, whether it was improper, and whether it unfairly prejudiced petitioner's case. Brady v. Maryland, 373 U.S. 83 (1963). The second category is an ineffective assistance of counseling stemming from Andres's acts and omissions. These claims require a different analysis. Strickland v. Washington, 466 U.S. 668 (1984). But while both claims involve a separate, initial analysis, they share a common ultimate question. Kyles v. Whitley, 514 U.S. 419, 434 (1995); see also In re Dunbar, 162 Vt. 209, 212, 218 (1994) (applying both Strickland and Brady). Specifically, Brady and Strickland both require us to determine whether the suppressed evidence or the errors of counsel create a reasonable probability of a different result. In re Dunbar, 162 Vt. at 212, 218. Thus, our analysis in

the individual sections will focus more heavily on the initial requirements of each test and reserve the ultimate question of effect for last.

## Suppression of the Reed Letters

Petitioner's complaint alleges that the failure to disclose the Reed letters was a Brady violation since it suppressed exculpatory evidence that the defense should have had at trial or directly thereafter. While, the suppression of evidence by prosecutors may create grounds for post conviction relief, Brady, 373 U.S. 83; In re Dunbar, 162 Vt. at 217, the question is when, if ever, did the the State's Attorney have a duty to disclose the Reed letters?

Brady imposes two duties on a prosecutor. See generally Comment, Brady v. Maryland and the Search for Truth in Criminal Trials, 63 U. Chi. L. Rev. 1673 (1996) (organizing Brady cases into two duties as a way of bringing "a better account of the prosecutor's obligations"). The first, the "classic" Brady duty, is to reveal information to the defense that the prosecution actually possesses. This is an issue of straightforward suppression where the prosecution has direct access to the evidence and knowingly fails to disclose. See, e.g., State v. LeClaire, 2003 VT 4, ¶¶ 8–9 (claim for failure to disclose hair sample of victim to defense); State v. Lewis, 151 Vt. 38, 40 (1988) (duty to disclose any material within its control that tends to negate the guilt of the defendant). In these cases, the prosecution either physically controls the evidence or it is within its close grasp.

Here, there simply is no evidence that the State's Attorney violated its classic Brady duty. It did not suppress any information in its possession. It provided the petitioner with the accusers' files and criminal records, a list of the State's witnesses, copies of Petitioner's statements to the detectives,

and the Reed letters once Corrections sent them to the State's Attorney. There is no evidence that the State's Attorney failed to disclose any relevant evidence within its direct control.

The second duty imposed by <u>Brady</u> is known as a "search <u>Brady</u>" and involves constructive possession imposed on the prosecution where some state agency has exculpatory information.[1]  <u>United States v. Brooks</u>, 966 F.2d 1500, 1502–03 (D.C. Cir. 1992).  In a search <u>Brady</u>, possession is imputed to the prosecution when it *should have* found the exculpatory information.  Petitioner relies on several search <u>Brady</u> cases for the bulk of his argument on this issue.  See, e.g., <u>United States v. Burnside</u>, 824

---

[1]Some commentators have suggested that this duty should be split into smaller duties that would attach to non-prosecuting government agencies.  63 U. Chi. L. Rev. at 1691–1704.  But, this concept has yet to find an audience with any court.  <u>Id</u>. at 1692–94.  The idea, however, that non-prosecutors have a classic <u>Brady</u> obligation is helpful on a conceptual level in understanding why some courts hold prosecutors responsible for information within agencies that the agency but not the prosecutor has reason to know might be helpful.  See, e.g., <u>United States v Smith</u>, 552 F2d 257, 261–62 (8th Cir 1977); <u>United States v Jennings</u>, 960 F2d 1488, 1492 (9th Cir 1992) (allowing non-prosecuting agencies to perform their own checks to satisfy <u>Brady</u>).  Nevertheless, it remains incorrect to impute <u>Brady</u> obligations to agencies.  Any obligation to disclose remains lodged with prosecutors.  <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972) (suppression of material evidence requires a new trial regardless of good or bad faith on the part of prosecutors).  Even if another agency suppresses the information, we are concerned with the scope of the prosecutor's constructive possession, not the agency's.  See <u>Kyles</u>, 514 U.S. at 438–40 ("[T]he prosecutor has the means to discharge the government's <u>Brady</u> responsibility . . . any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor . . . .").

F.Supp. 1215, 1254 (N.D. Ill. 1993) (error in prosecution's failure to seek informant's prison drug-testing records); Carriger v. Stewart, 132 F.3d 463, 480 (9th Cir. 1995) (informant witness's prison records should have been turned over to defense even though prosecution never obtained them).

The difficulty in applying a search Brady is that it does not involve a straightforward suppression. Courts applying this obligation have sought simultaneously to limit the scope of it to prevent prosecutors from becoming overwhelmed or responsible for nebulous information tucked into the far-flung corners of modern government. Burnside, 824 F. Supp. at 1254 ("Brady does not require the government to make its files available for review based upon the defense's speculation that the files may contain evidence favorable to the defense."). Rather than a particular legal standard, the duty imposed by a search Brady is dependent on the circumstances of the case that impute suppression. The result has yielded a less-than-salient doctrine. As one commentator summarized it, "Loose language in some opinions has left the misleading impression that courts are stating strict rules; however, more careful analysis reveals that these 'rules' are often ad hoc and case specific and they do not adequately describe the full range of Brady duties." 63 U. Chi. L. Rev. at 1675–76. Rather than simply applying Brady to the present case by analogy to other cases, as the petitioner urges, the State's Attorney's duty must be examined through four factors that courts have generally relied on to find constructive possession under Brady. See generally 63 U. Chi. L. Rev. 1673 (synthesizing the four factors from disparate Brady case law); see also Brooks, 966 F.2d 1502–04 (discussing the factors and policies involved in a search Brady situation); Commonwealth v. Donahue, 487 N.E.2d 1351, 1356 (Ma. 1986) (listing a similar set of factors for a search Brady analysis). The four factors include 1) the level of participation between the agency and the prosecution; 2) effort a prosecutor must expend to uncover

the evidence; 3) the likelihood that the evidence will be material based on what the prosecutor knows; and 4) ease with which the defendant could obtain the evidence.

## The Four Search <u>Brady</u> Factors

The first search <u>Brady</u> factor is establishing the context of the evidence by measuring the degree of participation between the agency holding the evidence and the prosecution.[2]  In the present case there are several connections between the State's Attorney and Corrections.  The two are state agencies; the incident took place inside a Corrections facility; and it involved an employee and two inmates in Corrections's custody.  Although quickly superceded, the investigation was started by Corrections staff on the night of the incident.  At trial, two Corrections employees testified for the prosecution.  These facts illustrate some degree of connection, if not cooperation, between the two agencies.

Balancing these considerations is the fact that Corrections was neither conducting nor directly involved in either the investigation or prosecution.  From the morning after the incident onward, the investigation was handled by the local police, who dealt directly with the State's Attorney.  By the time the evidence came into its possession, Corrections, as an agency, had all but ceased to be involved and had no particular reason to know as an agency if the prosecution was on-going.  The Petitioner had

---

[2] A search <u>Brady</u> only applies if another government agency has possession of the evidence.  <u>United States v. Deutsch</u>, . 475 F2d 55, 57 (5th Cir 1973) (noting that the prosecution does not have an obligation to get information from private parties).

been removed from his position, the accusers released, and the testifying employees spoke about their personal recollection rather than from some agency position, such as the Special Unit investigator did.[3]  Historically, Corrections does not participate in criminal investigations and prosecutions. It is neither an investigating nor a regulatory agency.  While it is a part of the criminal justice system, its role is wholly separate from adjudication of guilt.

Notwithstanding the event nexus, Petitioner has no evidence to support his allegation that Corrections was aware of the details of his prosecution—especially the issue of consent—or the relevance the letters would have had for his defense.  It is among these latter concerns that we place the greater weight of any context analysis.  Context requires a certain level of bureaucratic awareness and cooperation. See United States v. Wood, 57 F.3d 733, 737 (9th Cir. 1995) (FDA had obligation of disclosure based on their involvement with the prosecution throughout the trial).  Mere proximity of certain facts will not satisfy this factor.  See United States v. Joseph,  996 F.2d 36, 38–40 (3d Cir. 1993), cert denied 114 S. Ct. 357 (1993) (contradictory information from an officer given to a prosecutor in prior case was not covered by a search Brady in a latter case).  Despite the factual connections, Corrections was simply not a participant in the

---

[3] This point in particular is subtle but damning to Petitioner's argument. Correction's involvement with this prosecution had more to do with its role as the site of the crime than any official capacity.  Were the assault to have taken place at the Agency of Natural Resources, we would certainly expect several ANR employees to testify and discuss any relevant ANR procedure, but ANR itself would not be officially involved.  Any evidence that came into its possession, such as through one of its agents who found it in the woods, would not create the context required by this search Brady factor.

prosecution's case and had no reason to be aware of the evidence's context for the purposes of a search Brady obligation. Although our conclusion on this lack of context is dispositive by itself, we will analyze the remaining search Brady factors.

The second factor for constructive possession is the effort a prosecutor must expend to uncover the evidence. Brooks, 966 F.2d at 1503. While this overlaps to a certain extent with the context factor, the question of effort is triggered in part by time and specificity. The Reed letters in this case did not come in soon enough to be discovered during petitioner's trial. The first letter was sent only a month before trial and after the state's case had shifted from investigation to trial preparation. There is no evidence that by May the letter had been filed or indexed in any organized way such that it could be "discovered." The best that can be said about the first Reed letter is that it was "in the system" at the time of petitioner's trial. But it was not attached to any part of Young's file, and Reed was not directly connected to any part of Petitioner's prosecution. While its relevance was high, its discovery would have been accidental. Without a specific request from the defense that would have triggered the prosecution to search for such a specific piece of evidence, we will not put a duty on the prosecution to disclose such an unknown letter. United States v. Agurs, 427 U.S. 97 104–07 (1976). Of course, had defense counsel made a pre-trial request, "Does Corrections have any material pertinent to Young and Benjamin?" it seems the Department would have answered in the negative. For no professional or administrator has been shown to have read Reed's letter.

By contrast, after the trial Corrections received several more letters detailing the evidence Reed had against Young. These letters went to Corrections's legal counsel as early as June 2000 and raised enough interest

to set off an investigation.  It would have been quite easy at that point to have simultaneously released the Reed letters to the State's Attorney and by extension the defense.  For Petitioner, although convicted, had not been sentenced, had, in fact, switched counsel, and was continuing his defense as he moved to the next phase.  The sole reason behind Corrections' failure to disclose was a bureaucratic instinct to investigate Reed to see if his story "checked out."  Such an excuse does not relieve the prosecution of its on-going duty to disclose exculpatory information.  State v. Zele, 168 Vt. 154, 161 (1998) (citing Brady, 373 U.S. at 87; V.R.C.P. 16(b)(2)).

The third factor is the likelihood that the evidence will be material based on what the prosecutor knows.  Brooks, 966 F.2d at 1504 (discussing cases finding no Brady violation where the evidence was in a file or location whose search would have been triggered only by utter speculation).  While this is a low threshold and mainly protects the prosecution from pursuing wild goose chases on behalf of the defense, it is not a negligible standard.  See 63 U.Chi. L. Rev. at 1689–90.  Here, the Reed letters were unexpected as no other evidence in the case up to that time suggested that one of the accusers was planning to commit fraud.  While the credibility of the accusers was critical to the State's case, the attenuated connection between what the State's Attorney knew and the Reed letters (with their accusation of deliberate and premeditated fraud) is too much for this particular prong of Brady.  Every criminal case will contain its own set of "What ifs," and prosecutors cannot be held responsible for pursuing each and every one.  At the time the State's Attorney secured a guilty verdict against petitioner or anytime thereafter, it had no reason to believe or suspect that there were letters suggesting that at least one of the accusers was deliberately lying.  For this reason, we find

that the petitioner does not satisfy the third search <u>Brady</u> factor.[4]

The final factor for constructive possession is the ease with which the petitioner could obtain the evidence. <u>Commonwealth v. Donahue</u>, 487 N.E.2d 1351, 1355 (Ma. 1986). This factor is often used to limit the prosecution's duty to obtain information that the defense could easily find. 63 U. Chi. L. Rev. at 1690. Here, the information came to the attention of Corrections only after Petitioner was found guilty. At that time, Petitioner was unaware of the Reed letters or the fraud it alleged, and he no longer had the power to request discovery. In essence, he was powerless to seek this information in any meaningful manner. Therefore, it was highly unlikely that Petitioner could have obtained the Reed letters without their disclosure by the prosecution. Thus Petitioner's claim satisfies this prong of a search <u>Brady</u> analysis.

Nevertheless by triggering only two of the four search <u>Brady</u> factors, petitioner's claim that the State's Attorney had constructive possession of the Reed letters must fail. The failure to establish a duty in the prosecution to find the letters, means that there was no suppression for the purposes of <u>Brady</u>. This is conforms with other courts that have found a search <u>Brady</u> only where it is a necessary prosecutorial burden to prevent unworthy conduct. See also <u>Brooks</u>, 966 F.2d at 1502–03 ("Of course the prosecutor's own interest in avoiding surprise at trial gives him a very considerable incentive to search accessible files for possibly exculpatory

---

[4] This factor is a slightly different issue than the one raised by the question of whether the defendant requested the suppressed evidence. As the United States Supreme Court has stated, <u>Brady</u> applies to both specific pretrial requests and certain situations where there was no discovery request (or a particularly broad request). <u>Agurs</u>, 427 U.S. at 103–07; <u>State v. Goshea</u>, 137 Vt. 69, 74–75 (1979).

evidence, quite independent of Brady."). Petitioner's claim is close to establishing a contextual basis for a <u>Brady</u> violation, but his concerns are ultimately outweighed by the practical realities that disconnect the hands of government and the limits on what one can be expected to know of the other. We simply cannot require the State's Attorney to have constructive knowledge about the paperwork of every state agency.

## Ineffective Assistance of Counsel

Petitioner's claim for ineffective assistance of counsel is based on three areas of trial preparation and a fourth factually suggested by his evidence. Petitioner argues that Andres provided ineffective counsel when he 1) failed to impeach Benjamin on her prior criminal record; 2) failed to prepare an effective case for defendant; and 3) failed to prepare petitioner for testifying. Petitioner also notes that Andres failed to pursue any plea agreement on his behalf or work with the State's Attorney to obtain a deal that would have reduced his possible sentencing exposure.

Under <u>Strickland</u>, a petitioner's claim for ineffective assistance of counsel requires a two part analysis. <u>In re Dunbar</u>, 162 Vt. at 211–12 (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687–88 (1984)). The performance of counsel for the first prong must fall below an objective standard of reasonableness informed by prevailing professional norms. <u>Id</u>. If counsel's actions have violated this standard, then petitioner must demonstrate that the deficient performance prejudiced his defense. <u>Id</u>. This second prong is more subjective and looks to the effect of counsel's actions within the context of the trial and their materiality to its outcome. To this second prong, we note that the nature of Petitioner's claim is such that nearly any claim that meets the first prong will most likely satisfy the

second.[5]

Petitioner's first claim is that Andres should have tried to impeach Benjamin on her prior criminal record, which included a 1983 conviction for impersonating a nurse and stealing money from old people. Andres did try to use these convictions but was blocked by the court because of the proscriptions of V.R.E. 609. Petitioner argues that Andres should have still tried to impeach Benjamin on her criminal record by asking her about the facts of her convictions under V.R.E. 608(b) (bad acts). This is a questionable and possibly objectionable tactic for which petitioner does not cite to supporting caselaw. Choosing not to engage in an adventurous impeachment method does not qualify as ineffective assistance. As the Vermont Supreme Court has noted previously:

> The right of cross-examination is fundamental, but the failure to exercise that right does not necessarily show ineffective representation. It is well known that cross-examination may hurt more than help. The decision . . . is a matter of trial tactics involving many factors rarely appearing of record. We cannot rule that failure to cross-examine conclusively demonstrates ineffective representation . . . .

In re Bousley, 130 Vt. 296, 302 (1972) (quoting Slaughter v. United States, 89 A.2d 646, 647–48 (Mun. Ct. App. D.C. 1952)), cited in In re Mecier,

---

[5] This is due primarily to the he said/she said nature of the underlying trial and the fact that this was a case about credibility, rather than physical evidence.

143 Vt. 23, 30 (1983).

We cannot conclude that Andres's failure to cross-examine Benjamin on her prior convictions or their underlying details represents anything more than a reasoned decision following from the court's ruling. But, Benjamin's prior criminal record, much of it dating to the 1970s and 80s, was only part of the available information about Benjamin and Young's criminal records that included other, more recent convictions, a history of drug use, and other details (such as the reason they were incarcerated in the first place) that might have caused a jury to doubt their credibility. Andres chose not to cross-exam on any of this material because as he said later, "I typically don't cross-examine on convictions anyway, because I don't—I have never thought that that has been a particularly illuminating factor as to whether or not someone was truthful of not." (Tr. Trans., at 33, May 25, 2000.) Yet going into trial, the accusers' criminal records were one of the few real areas that Andres had to use for impeachment.

Given the importance of the accusers' testimony and their credibility, Andres's performance, regardless of his personal preference, raises an issue of ineffective assistance. This is not to say that hindsight makes clear that Andres would have profited from the prior convictions, even if used as 608(b) evidence. Strickland is not a test of hindsight or a way to second-guess defense strategy. Perrero v. State, 990 S.W.2d 896, 898 (Tex. App. 1999) (quoting Beck v. State, 976 S.W.2d 265, 268 (Tex. App. 1998)). Rather, this is a conclusion from the context of the trial that shows Andres's "technique" was more simply a failure to exploit substantial and strong sources of impeachment material.

At the same time, summary judgment in favor of Petitioner would be inappropriate at this time. Petitioners' argument, as well as Andres's justification for his choice, depend on whether this is an evaluation of a choice or objective trial technique. See, e.g., In re Mecier, 143 Vt. at 30–31 (analyzing the tactics employed by defense counsel to determine effectiveness of assistance within the context of the trial). Currently, Petitioner and the State dispute the amount of preparation and planning that Andres performed on Petitioner's behalf. The difference is important. If Andres merely ignored the accusers' criminal records out of habit, or worse, then there is a basis for Petitioner's claim. If, however, Andres's decision reflected, as he claims in his affidavit, a thoughtful analysis of the evidence and a reasoned decision within the full context of the trial, then any review of his choice would become inappropriate hindsight. While the record shows evidence that Andres's performance was the former, there is enough dispute to make summary judgment inappropriate.

Petitioner's next claim is that Andres failed to prepare him to testify before calling him as a witness. Although Petitioner did consent to this decision, it is fairly well-established that an attorney's failure to prepare a defendant in a criminal trial before calling him is a violation of the objective standard of reasonableness. United States v. Rhynes, 218 F.3d 310, 319 (4th Cir. 2000) ("No competent lawyer would call a witness without appropriate and thorough pre-trial interviews and discussion."); Perrero, 990 S.W.2d at 899; People v. Sweitzer, 1998 WL 1991087, at * 3 (Mich. App.); Note, How to Thread the Needle:  Toward a Checklist-based Standard for Evaluating Ineffective Assistance of Counsel Claims, 77 Geo. L.J. 413, 439 (1988); see also Galvan v. State, 2000 WL 1038159, at *7 (Tex. App.) ("While counsel's performance was certainly not perfect in [failing to prepare defendant], no prejudice to Appellant resulted from it."). There is no doubt that this "failure" led to substantial prejudice.

Petitioner's case ultimately came down to an issue of credibility. Andres called only the petitioner as a defense witness. We find it well below the objective standard of reasonableness to call the defendant as a witness when the entire issue is credibility and not prepare him in any way for either direct or cross-examination. Again, however, summary judgment would be inappropriate at this time. Andres's affidavit contradicts Petitioner's claim of no preparation and states that he did prepare Petitioner for both direct and cross-examination. This material fact must be resolved by a hearing and through findings.

The next claim raised by Petitioner is Andres's failure to prepare an effective case against the prosecution and their witnesses. Specifically, petitioner cites to Andres's failure to depose any witnesses, to investigate Young or Benjamin's records with the Department of Corrections, to review discovery materials with Petitioner, and generally to engage in the adversarial process. As the facts demonstrate, Andres did secure the prisoners' criminal record and prior interview statements. At trial Andres vigorously cross-examined the accusers and went into great detail, trying to draw out some inconsistency with either the other's statements or their prior interviews with police. This included attempts to establish that the accusers were giggling when they returned to their cells after their supposed assaults as well as the inconsistencies in their story about the actual assault. (Tr. Trans., at 166, 171–72, 190–92).

While locking in the accusers statements through sworn depositions might have given Andres a slightly more effective record on which to cross-examine them, petitioner presents no evidence that Andres faltered or failed to examine on an issue because he lacked a deposition. The issue was relatively straightforward—Were the accusers or the petitioner telling

the truth regarding consent?  There were no other complex defense theories or chain of events to nail down through testimony.  Cf. <u>Harris By and Through Ramseyer v. Wood</u>, 64 F.3d 1428, 1435 (9th Cir. 1995) (finding a deficiency where defense attorney failed to interview any witnesses on a list of 32 where prosecution called 19 at trial).  Taking depositions is an effective component of trial preparation, but it is neither required nor universally accepted as a part of trial preparation.  Indeed, in most states it is not even an available tool. We cannot conclude that Andres's failure to take the depositions, regardless of his pre-trial intent to take them, represents a failure of counsel in an objective sense.  What effect it had on petitioner's trial is mere speculation, hindsight and missed opportunity.  <u>In re Mecier</u>, 143 Vt. at 32.

As to the remaining elements of this claim, we have already discussed the nature and role the accusers' prison records would have had on the trial.  This leaves the failure to disclose discovery materials or engage in the adversarial process.  These are best seen as cumulative deficiencies.  See <u>Harris</u>, 64 F.3d at 1438–39.  This requires only a quantitative analysis.  <u>Id</u>. (quoting R. Van Cleave, <u>When Is An Error Not An "Error"? Habeas Corpus and Cumulative Error</u>, 46 Baylor L.Rev. 59, 60 (1993)).  Adding the failure to depose and to seek out the prison records, the petitioner cites to four cumulative failures of defense counsel.  Cf. <u>Harris</u>, 64 F.3d at 1438 (listing 11 mistakes by counsel in addition to several uncontested deficiencies).

Notwithstanding these errors, Petitioner's argument for cumulative error is weakened by the fact that Andres was prepared to argue and provide a partially effective defense.  In his favor, Andres was familiar with the record and incidents of this case, conducted long cross-examinations,

and vigorously opposed the motions to exclude his evidence.[6]  Taken in context, these do not seem to generate enough evidence to trigger a cumulative error.  See Harris, 64 F.3d at 1438 (suggesting that Strickland requires a higher number of cumulative errors).   But, our determination must wait for a hearing on these claims and a factual determination of the other areas of ineffective assistance of counsel to determine the actual scope and extent of Andres's cumulative error.

Finally, Petitioner suggests through his evidence one last area of ineffective assistance of counsel.  Prior to the trial, Andres does not appear to have engaged or attempted to secure any type of plea bargain arrangement for Rushford.  Given the nature of the crime, the questionable situation of the witnesses, and the difficulty in prosecuting such claims, it is hard to believe that the State's Attorney was not interested or motivated in negotiating with Andres for a guilty plea in exchange for a reduced sentence.  Since Petitioner was facing a potentially large sentence—and, indeed, received one—it would have been in his interest to seriously explore any and all offers from the prosecution.

---

[6] Andres did make some simple errors in his presentation.  A typical one was his apparent confusion about an officer assignment sheet marked "cabbage night" with the night of the incident, October 31.  (Tr. Trans., at 97.)  "Cabbage night"is the night before Halloween, October 30, when children are known to engage in mischief and pranks against property.  Andres's error was not necessarily with the term but the date, which had been smudged to look like either 10/30 or 10/31.  Still, the fact that he was making these mistakes and clarifications at trial, rather than in depositions or hearings, goes to Petitioner's larger theme that Andres did not prepare a defense required by objective professional standards but relied on his own perceptions of courtroom ability.

This failure to explore plea bargaining has been held in some cases to constitute ineffective assistance. Annt., <u>Adequacy of Defense Counsel's Representation of Criminal Client Regarding Plea Bargaining</u>, 8 A.L.R.4th 660, at §§ 4[b], 4[c] (1981, Supp. 2005). While Petitioner's evidence raises this issue for the purposes of summary judgment, any findings will require a contrast between what Andres did or did not do to plea bargain on Petitioner's behalf along with further evidence about the statistical likelihood his case had of going to trial—as compared with other sexual assault cases in Chittenden County. See, e.g., <u>State v. Holm</u>, 957 P.2d 1278, 1281–82 (Wash. App. 1998) (citing ABA Standards for Criminal Justice, Standard 4-6.1 to 4-6.2). This evidence would also be more clear with a background of how the State's Attorney have prosecuted and settled other rape cases.

We are particularly interested in this claim because the evidence shows that Andres made only minimal preparations for trial. His failure to depose any of the witnesses, investigate Petitioner's versions of events or generate any substantial pre-trial evidence demonstrates a lack of interest in negotiating or building leverage for Petitioner position. This failure, in light of the stakes involved in this case, represents fairly ineffective assistance counsel.

Based on the foregoing, Petitioner's motion for summary judgment in so far as it is grounded on <u>Brady</u> is Denied. The State's motion for summary judgment is Granted in part and Denied in part.

Dated at Burlington, Vermont_____, 2004.