McLaughlin, David A., J.
INTRODUCTION
This motion arises from the conviction thirty-two years ago of the defendant, Edward Lykus (“the defendant”), for first-degree murder, kidnapping, and extortion. The defendant has previously filed one direct appeal of his conviction, two motions for a new trial pursuant to Mass.R.Crim.P. 30(b), and three motions for relief from his sentence pursuant to Mass.R.Crim.P. 30(a), all of which were unsuccessful. In this motion, the defendant argues that he should be granted a new trial because the discovery of new evidence, two advancements in science and technology, and the revelation of the violation of his attorney-client privilege require the court to allow this motion for a new trial in the interests of justice. For the following reasons, the defendant’s motion for new trial is ALLOWED.
FINDINGS OF FACT
The court has decided this motion based on a review of all credible evidence, as well as inferences reasonably drawn from the evidence. The court exercised its discretion in not holding an evidentiary hearing, and makes the following findings of fact. Mass.R.Crim.P. 30(c)(3); Commonwealth v. Meggs, 30 Mass.App.Ct. 111, 114 (1991).See generally Commonwealth v. Stewart, 383 Mass. 253, 258-60 (1981).
The defendant was convicted in 1973 for the kidnapping and first-degree murder of then-thirteen-year-old Paul Cavalieri, and for the extortion of Paul’s father, Anthony Cavalieri. The evidence against the defendant was voluminous and, ultimately, overwhelming. Although the evidence on which the jury could have based its verdict has been set forth in detail though several opinions authored in response to the defendant’s various past pleadings, certain circumstances of this case will once again be described to illustrate the factual predicate to the arguments made by the defendant in his instant motion for new trial.
Paul Cavalieri disappeared in the early evening of November 2, 1972. Two days later, Paul’s mother received a telephone message in which the caller whispered to her, “You will receive instructions.” Mrs. Cavalieri did not recognize the caller’s voice. In response to this phone call, Mrs. Cavalieri contacted the North Attleboro police.
Three days after the initial phone call, Paul’s father, Anthony Cavalieri, received a handwritten note demanding a $50,000 payment. The note read:
Tony, we have your son Paul. We want $50,000 in small bills in a brown bag. Don’t tell the cops about this because we will be watching veiy closely and if there are any mess-ups, your son is dead. Come alone with the money and drop it off Tuesday night at 10:00 p.m. at the stop sign off Chestnut Street and Oak Street in back of the pine tree right near it. Your son will be released if there are no mess-ups, because he has never seen us before. You’d better heed to what we say. We know you’ve notified the police by now so we will be taking precautions. Do as we say and everything will be alright. This is nojoke.
Following the receipt of the ransom note, the Cavalieris once again called the North Attleboro police who, along with an agent of the Federal Bureau of Investigation (“FBI”), came to the Cavalieri house that day. With the permission of the Cavalieris, the FBI placed a recording device on the Cavalieris home telephone which both recorded and helped to trace the origin of all incoming calls.
*600 Over the next two days the Cavalieris received four telephone calls relative to the kidnapping. Mr. Cavalieri did not recognize the caller’s voice on any of the telephone calls.
As a result of the telephone calls and the instructions in the ransom note, the Cavalieris gathered the demanded $50,000 and, in cooperation with the North Attleboro police and the FBI, arranged to make delivery of the money. Mr. Cavalieri left the ransom money at a location designated by the caller. Just after midnight on November 10, 1972, police observed a white male in a station wagon pick up the money. Sometime later, and not far away, the police observed a man carrying a white bag come out of the woods and enter a red station wagon. A check of the vehicle’s registration by the police revealed it belonged to a man named Tardiff. This Tardiff informed the police that the defendant had persuaded him to drop off the defendant on a highway near the location where the ransom money was left, and to pick up the defendant at a prearranged place at a later time. Following their interview of Tardiff, the police arrested the defendant.
During questioning conducted by the police, the defendant admitted that he had picked up the package containing the ransom money, but maintained that he had done so only because a man in the drug trafficking business had paid him $500. The defendant also denied making any telephone calls to the Cavalieris. The defendant informed the police that, as instructed by the man who hired him, he left the ransom money at a prearranged location.
Following their interview of the defendant, the police recovered the ransom money, although the money was not at the location told to the police by the defendant. The police learned of the location of the ransom money from a man named Delaney, in whom the defendant had confided the location of the money. Additionally, the police collected a package of black bags from the defendant’s motor vehicle; these bags were identified as the same kind of bag that contained the ransom money that the police recovered. Further, the defendant’s personal effects and motor vehicle were stained by the type of dye which had been put on the ransom money.
On April 12, 1973, the body of Paul Cavalieri was recovered from a wooded area in North Attleboro. An examination of the body determined that death had been caused by three gunshot wounds, likely from a .38 caliber Colt revolver that was recovered from the defendant’s apartment. Testimony at trial revealed that the bullets could have been fired from the .38 Colt revolver found in the defendant’s apartment because the rifling impressions found on the bullets were consistent with impressions created by that weapon. Forensic analysis of the bullets recovered from Paul Cavalieri’s body was inconclusive. Oxidation of the bullets caused there to be a lack of sufficient markings that would normally have been used to precisely identify the weapon from which the bullets were fired. However, FBI Special Agent John P. Riley testified for the Commonwealth that the bullets found in Paul Cavalieri’s body were similar in composition to the bullets found in a box in the defendant’s apartment, and that the possibility that the bullets recovered from the victim’s body had not come from the box of bullets found in the defendant’s apartment was “remote.”[1] Additional forensic evidence linking the defendant to the kidnapping included an examination of staples from the ransom note that were found to be consistent in manufacture and size with a stapler and staples owned by the defendant.
Aside from the forensic evidence presented at trial, the Commonwealth also introduced evidence derived from recordings made of the defendant’s voice and from the tape recordings made from the ransom calls to the Cavalieri household. The Commonwealth played one of the recorded ransom calls for eight witnesses at trial. Of the eight witnesses, seven identified the voice on the recording as belonging to the defendant. The other significant evidence relating to voice recordings came from the Commonwealth’s expert’s analysis of voice exemplars made of the defendant’s voice. At trial, the Commonwealth introduced into evidence the expert analysis of Lt. Ernest Nash from the voice identification unit of the Michigan State Police. Lt. Nash used spectrographic voice analysis to compare a recording of the defendant’s voice with a recorded ransom telephone call and concluded that the defendant’s voice was the voice on the ransom call.[2]
On the strength of this evidence, the juiy found the defendant guilty of the kidnapping and first-degree murder of Paul Cavalieri, and of the extortion of Paul’s father, Anthony Cavalieri. Following the return of guilty verdicts against the defendant, the trial judge sentenced him to a life sentence for the first-degree murder, a concurrent life sentence for kidnapping, and a sentence of ten to fifteen years for extortion, to be served from and after the two life sentences. The defendant today remains incarcerated.
ISSUES PRESENTED
The defendant’s motion for new trial advances severed arguments in support of post-conviction relief. First, the defendant asserts that the Commonwealth failed to disclose exculpatory evidence — FBI laboratory reports on voice recordings — to the defense at trial. The defendant claims that this alleged failure to disclose constituted a Brady violation that deprived him of his due process rights under both the state and federal constitutions. Second, the defendant argues that the expert opinion testimony related to voice identification, based in part on a visual analysis of spectrograms (also known as “voiceprints” or “voicegrams”) was improperly admitted because scientific analysis conducted and published subsequent to the defendant’s trial has concluded that voice identification via a visual analysis of spectrograms is not a *601 reliable forensic technique within the relevant scientific communiiy. The defendant claims that this subsequent scientific development renders such testimony inadmissible under both the Frye v. United States test used to determine admissibility of scientific evidence at the time of the defendant’s trial, and under the test used by courts today as developed in Daubert v. Merrell Dow Pharmaceuticals, Inc. and Commonwealth v. Lanigan.
Third, the defendant maintains that his counsel at trial violated the attorney-client privilege by disclosing to FBI Agent Richard Krant the location of a portion of the ransom money. The defendant claims that he never assented to this disclosure and that the disclosure led law enforcement agents to the discovery of inculpatory evidence. The fourth and final argument raised by the defendant, and brought before the court through the defendant’s Addendum to His Motion for Post-Conviction Relief, is that the evidence concerning bullet composition was improperly admitted. The Commonwealth’s expert analyzed the composition of the bullets recovered from the victim’s body and the bullets found in a box in the defendant’s home and concluded, in substance, through the methodology of compositional analysis of bullet lead (known as “CABL”), that the bullets in the victim’s body came from the box of bullets in the defendant’s home. The defendant points to newly discovered evidence that calls into question the validity of CABL methodology and argues that this newly discovered evidence renders the evidence admitted at his trial inadmissible.
DIRECT ESTOPPEL AND WAIVER DISCUSSION
As discussed briefly above, the procedural history of this case is lengthy and, at times, quite complicated. Prior to this motion, the defendant had filed three motions for relief from his sentence pursuant to Mass.R.Crim.P. 30(a), and two motions for new trial pursuant to Mass.R.Crim.P. 30(b), as well as a direct appeal of his conviction. Before analyzing the issues raised by the defendant in this, his third motion for new trial, the court must address the possibility of collateral estoppel and waiver due to the threat of repetition between the numerous legal arguments already asserted by the defendant and those brought forward in this motion.
Although the defendant has filed numerous post-conviction motions, only two of his motions, and the rulings on those motions, are relevant to the issue of collateral estoppel. The first post-conviction ruling came on the defendant’s direct appeal of his conviction in Commonwealth v. Lykus, 367 Mass. 191 (1975) [Lykus I). The basis for the defendant’s appeal in Lykus I was the argument that the trial judge improperly admitted the expert testimony of Lt. Nash relating to making a voice identification based on voice spectrogram analysis. See Lykus I, 367 Mass. at 195-96. The Court examined the trial judge’s applications of the then-existing legal tests governing the admissibility of scientific evidence and concluded that Lt. Nash’s expert testimony was properly admitted. Id. at 204 (“The considerable reliability provided by the Tosi experiment, the greatly added reliability induced by the application of further skills by the experienced examiner working under forensic conditions, and the totality of the evidence received at the voir dire hearing which tended to minimize the importance and weight of adverse or skeptical writings all serve to support a conclusion of general acceptability as required by the rule of Fatalo and Frye”). The next of the substantive motions filed by the defendant was his second motion for new trial. See Commonwealth v. Lykus, 406 Mass. 135 (1989) [Lykus II). In Lykus II, the defendant advanced three arguments in support of his claim that a new trial was warranted: (1) ineffective assistance of counsel through trial counsel’s failure to move to suppress evidence obtained by a wiretap; (2) improper instruction by the trial judge regarding the time of death of the victim; and (3) ineffective assistance of counsel at the defendant’s sentencing hearing. Id. at 136. The Court concluded that the defendant’s first two arguments lacked merit and upheld the motion judge’s denial of the defendant’s motion for a new trial, however, the case was remanded for resentencing as the Court did find that defense counsel’s representation was constitutionally deficient. Id. at 145. A comparison of the arguments already posited by the defendant with those positions advocated today reveals a duplicitous argument: that scientific evidence relating to voice identification was improperly admitted by the trial judge. Thus, the principle of issue preclusion, or, more correctly, direct estoppel, must be resolved.[3]
Direct estoppel applies when a defendant raises an issue that has already been actually litigated and determined in an earlier proceeding, when the determination of that issue in the earlier proceeding was essential to the defendant’s conviction, and when the defendant had an opportunity to obtain review of the determination. See Commonwealth v. Rodriguez, 443 Mass. 707, 710 (2005). The Commonwealth argues that the defendant has already litigated the issue of the admissibilily of voice identification evidence and therefore he cannot now raise the same issue. Although the argument presented by the defendant in his direct appeal in Lykus I is strikingly similar to the issue now before the court, there is one key factor that sufficiently distinguishes the issue previously argued, therefore requiring this court to analyze the defendant’s argument.
In his direct appeal in Lykus I, the defendant, without further elaboration, claimed that the evidence relating to voice identification was improperly admitted. Today, the defendant still argues that the testimony of Lt. Nash was inadmissible, but does so on the ground that newly discovered evidence, in the form of *602 a National Research Council study, concludes the forensic examination performed by Lt. Nash is inherently unreliable and not accepted within the relevant scientific community. Whether the defendant’s argument has merit is discussed in much more depth below. However, the point the court now makes is that the argument presented in this motion is distinct from the argument already litigated in the defendant’s direct appeal. See Commonwealth v. Clayton, 63 Mass.App.Ct. 608, 611 (2005) (stating, in holding direct estoppel barred defendant’s argument, “In this appeal, the defendant makes no new factual or legal argument. He offers only that [his prior appeal] was wrongly decided . . .”). See also King v. Driscoll, 424 Mass. 1, 8 (1996) (“An issue once decided, should not be reopened unless the evidence on a subsequent trial was substantially different. . .”) (emphasis added) (internal citations omitted). Because the publication of the National Research Council report provides the defendant a novel theory on which to ground his argument, the principles of direct estoppel do not apply and the defendant is not barred from bringing this issue in his motion for new trial.
Likewise, the doctrine of waiver does not prohibit the defendant from raising this claim as it could not have been previously argued at trial or on his direct appeal since the scientific evidence on which he now relies was not “sufficiently developed to put him on notice that the issue is a live issue.” Commonwealth v. Amirault, 424 Mass. 618, 639 (1997), quoting Commonwealth v. Bowler, 407 Mass. 304, 307 (1990).
Although the defendant’s argument regarding the admissibility of testimony concerning voice spectrogram analysis is not waived, the doctrine of waiver nevertheless must be applied to the defendant’s claim that his trial counsel violated the attorney-client privilege.
The Commonwealth is quite correct that the trial transcript reveals that both the defendant and his trial counsel were aware of the testimony of FBI Agent Krant relating to Krant’s conversation with trial counsel. The defendant and his counsel learned of this information before his 1973 conviction, and the defendant was aware of the alleged violation during each of his subsequent five post-conviction motions for relief. At no time prior to the instant motion has the defendant raised this argument, and while it is arguably correct that the claim could not have been raised in the defendant’s direct appeal as that appeal was handled by trial counsel, the defendant had four other opportunities when trial counsel was not involved to state his position and consistently failed to do so. See Amirault, 424 Mass. at 639 (“the defendant who had a fair opportunity to raise [an issue] may not belatedly invoke that [issue] to re-open a proceeding that has already run its course”).
Because the defendant had ample opportunity prior to this motion to argue that the attorney-client privilege was violated, but failed to do so, the defendant is deemed to have waived the argument and cannot now present the matter to the court. As such, the court’s analysis of the defendant’s instant motion for new trial will be limited to the defendant’s arguments that: (1) the Commonwealth failed to disclose exculpatory evidence; (2) scientific evidence relating to the voice identification procedure conducted via a voice spectrogram was improperly admitted; and (3) scientific evidence of bullet composition using the compositional analysis of bullet lead methodology was improperly admitted.
DISCUSSION AND RULINGS OF LAW
“The trial judge upon motion in writing may grant a new trial at any time if it appears that justice may not have been done.” Mass.R.Crim.P. 30(b). The standard is purposefully broad, and the disposition of a motion for new trial is addressed to the sound discretion of the trial court. Commonwealth v. Schand, 420 Mass. 783, 787 (1995); Commonwealth v. Moore, 408 Mass. 117, 125 (1990).
I. THE COMMONWEALTH’S FAILURE TO DISCLOSE THE FBI LABORATORY REPORTS RELATING TO VOICE IDENTIFICATION ANALYSIS
The defendant’s first argument in his motion for new trial is that the Commonwealth at trial failed to disclose exculpatory evidence, despite a specific request for such evidence, and that such a failure deprived the defendant of his rights to due process under both the state and federal constitutions. Specifically, the defendant states that the FBI laboratory performed scientific tests comparing the voice prints of the defendant with the voice prints of the man who made the ransom calls to the Cavalieri household. The FBI analysis of these voice prints determined that “it was not possible to definitively determine whether the unknown voice was that of Lykus.” See December 12, 1972 Memo from FBI Laboratory to Special Agent in Charge, Boston Office. The defendant argues, correctly so, that the results of these reports were required to be disclosed to the defense in light of an order from the trial judge.[4] The FBI was made aware of the defendant’s request and the trial judge’s order, as evidenced by an internal FBI memorandum which states, “In order to comply with subject motion, Assistant District Attorney, Somerset County, Massachusetts requested he be furnished statement made by subject [the defendant] to the FBI; copy of FBI Laboratory reports; . . . and the voice exemplars made at the time of the subject’s arrest.” See March 22, 1973 Memo from Acting Director, FBI to Special Agent in Charge, Boston Office. The FBI, however, consciously and inexcusably chose to ignore the order of this court and instructed its Boston office not to disclose its reports to the District Attorney who made a specific request for such documentation. See March 28, 1973 Memo from Acting Director, FBI to Special Agent in *603 Charge, Boston Office.[5] The defendant now argues that the decision not to disclosure this exculpatory evidence, even though a decision made solely by the FBI, is attributable to the Commonwealth and resulted in a violation of the defendant’s due process rights. As such, the defendant claims that he is entitled to a new trial.
The legal rules governing the disclosure of exculpatory evidence are well known and oft-cited, but a brief review of the historical underpinnings and current parameters of the rules are certainly warranted in light of the defendant’s argument.
The seminal decision regarding the rule of disclosure was set forth over forty years ago in the United States Supreme Court opinion in Brady v. Maryland, 373 U.S. 83 (1963). In Brady, the Court recognized that the goal of the criminal justice system was the fair prosecution of an accused, and thus held that “suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” Brady, 373 U.S. at 87. The Brady rule was later expanded in United States v. Agurs, 427 U.S. 97 (1976), when the Court held that even in the absence of a discovery request from the defendant, the prosecutor must nevertheless turn over to the defendant obviously exculpatory evidence in his possession. Agurs, 427 U.S. at 108. The next clarification from the Court came in United States v. Bagley, 473 U.S. 667 (1985), when the Court defined the adjective “material” in an attempt to better explain what evidence was automatically due the defendant. The Bagley Court held that evidence was “material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” Id. at 682. The Massachusetts courts do not strictly adhere to the Agurs/Bagley materiality standard, but rather apply a standard that requires only that a defendant who has specifically requested exculpatory evidence demonstrate that a substantial basis exists for claiming prejudice from non-disclosure. See Commonwealth v. Gallarelli, 399 Mass. 17, 20-21 (1987). See also Commonwealth v. Tucceri, 412 Mass. 401, 407 (1992).
Contrary to the Commonwealth’s opposition argument, there can be little question that a laboratory report, prepared by the professionals at the FBI, and which concluded that the FBI could not state with certainly whether the voice on the recorded ransom telephone calls was the voice of the defendant, is exculpatory evidence which, it is reasonably probable to state, could have changed the outcome at the defendant’s trial. See Commonwealth v. Healy, 438 Mass. 672, 679 (2003) (“Exculpatory in this context is not a narrow term connoting alibi or other complete proof of innocence . . . but rather comprehends all evidence which tends to negate the guilt of the accused ... or, stated affirmatively, supporting the innocence of the defendant”) (internal citations omitted).
Unfortunately, the issue presented by the defendant — whether the failure of the FBI to disclose their laboratory reports to the Commonwealth can be imputed to the Commonwealth such that the FBI’s failure shall be viewed as the Commonwealth’s failure — is not answered simply by examining the nature of the FBI laboratory reports and determining whether they were exculpatory evidence in need of disclosure. Rather, the defendant’s argument requires an analysis of the nature of dual sovereignly, and whether one seemingly innocent and independent government must suffer the evils of a culpable, but equally independent, government. If the court finds that the Commonwealth should bear the consequences of the FBI’s malfeasance, the defendant would then clearly have been denied material, exculpatory evidence by the Commonwealth, and a new trial must be granted so that a jury would be able to adjudge the defendant’s guilt or innocence in light of this evidence. If, however, the FBI’s non-disclosure is not to be imputed to the Commonwealth, then the court would not view these FBI laboratory reports in the light of a discovery violation, but as newly discovered evidence, and whether a new trial should then be granted is determined by a different standard.
A motion for new trial based upon the discovery of new evidence is granted only if the evidence “is newly discovered and . . . casts real doubt on the justice of the conviction.” Commonwealth v. Grace, 397 Mass. 303, 305 (1986). Any new evidence must “not only be material and credible . . . but also must carry a measure of strength in support of the defendant’s position.” Id. (internal citations omitted).
Although as explained above, the Brady rule requires that the prosecutor disclose to the defense all material evidence, the application is not as clear-cut as the rule would make it appear. The prosecutor is not required to “investigate all exculpatory evidence that may exist, or to produce exculpatory evidence held by government agencies other than the prosecutor and police, or to give discovery of every aspect of the case.” Commonwealth v. Donahue, 396 Mass. 590, 597 (1986) (internal citations omitted). Instead, the Commonwealth’s duty of disclosure is limited to the evidence in the possession of the prosecutor and information in the possession of persons “sufficiently subject to the prosecutor’s control.” See Commonwealth v. Martin, 427 Mass. 816, 824 (1998). See also A.B.A. Standard for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial 2.1(d) (Approved Draft 1970) (“The prosecuting attorney’s obligations . . . extend to material and information in the possession or control of members of his staff and of any others who have participated in the investiga *604 tion or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office”). A person or agency is considered “subject to the prosecutor’s control” when that person or agency is acting, in some capacity, as an agent of the government in the investigation and prosecution of a particular case. See Commonwealth v. Beal 429 Mass. 530, 532 (1999). See also Kyles v. Whitley, 514 U.S. 419, 437 (1995) (“[T]he individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government’s behalf in the case, including the police”).
The defendant argues that the FBI “of course, was a prosecution agent,” and supports such a statement by citing the extensive cooperation between the FBI and the local police along with the District Attorney. The defendant notes that the FBI installed the wiretap on the Cavalieri household telephone; the FBI worked with the North Attleboro police to observe the drop-off and pick-up of the ransom money; the FBI arrested and repeatedly interrogated the defendant; the FBI searched the defendant’s apartment and automobile; and the FBI provided a range of forensic analysis for the police and the District Attorney’s Office, including an examination of the bullet lead, the defendant’s handwriting, soil analysis, and the comparison of a recording of the defendant’s voice with the recorded ransom telephone calls. The defendant asserts that this extensive cooperation renders the FBI an agent of the Commonwealth, and therefore, imputes to the state prosecutor the actions of the FBI. The Commonwealth, however, counters that the malfeasance of the FBI, “an agency over which the Commonwealth has no jurisdiction, that conducted an independent voice-print analysis as part of its investigation of the defendant and made the conscious decision to withhold all information about the existence of the test” cannot be imputed to the Commonwealth because the FBI is not fairly described as an agent of the Commonwealth. In support of their respective positions, both parties cite to Commonwealth v. Donahue, 396 Mass. 590 (1986), a case which is instructive on when a state prosecutor must ask a federal agency for exculpatory information, but which unfortunately does not directly answer the precise question presented here.
In Donahue, the defendant was convicted of armed robbery and sentenced to life imprisonment. See Donahue, 396 Mass. at 591. Prior to trial, however, the defendant subpoenaed an FBI agent who was involved in the investigation of the bank robbery, and requested from this agent all of his records stemming from the investigation. Id. at 593. The agent refused to disclose the contents of his investigation file, and told defense counsel that there was no information that would be of assistance. Id. Approximately one year after his conviction, however, the defendant learned that a witness who did not testify at trial gave this FBI agent a statement that tended to exculpate the defendant. Id. at 593-94. In light of this discovery, the defendant moved for a new trial and a hearing on the motion was granted. Id. at 594. The motion judge found that the FBI twice interviewed that witness and made reports of both interviews. Id. at 594-95. After reviewing the reports, the motion judge concluded that the witness’s statements contained in the reports was exculpatory and material, but that the state prosecutor had made a “full and complete disclosure of all exculpatory evidence that was in the possession and custody of its office” and that the state prosecutor had no knowledge of the FBI interviews and reports until after the defendant filed his motion for new trial. Id. at 595-96.
The discrete issue addressed by Donahue was a determination of when a state prosecutor is obligated to seek exculpatory evidence, that the defendant has already requested and been unsuccessful in obtaining, from federal authorities. See Donahue, 396 Mass, at 597. The Court answered this question by starting with the bedrock principle that a prosecutor only need disclose exculpatory evidence that is in his possession or is held by another government agency under the control of the state prosecutor. Id. at 597. The Court further analyzed the question before it by listing a series of factors that would be relevant in any discussion regarding when a prosecutor must request information from a federal authorify. Those factors include “the potential unfairness to the defendant; the defendant’s lack of access to the evidence; the burden on the prosecutor of obtaining the evidence; and the degree of cooperation between State and Federal authorities, both in general and in the particular case.” Id. at 599.
The defendant in the instant case argues that the application of the Donahue factors requires this court to conclude that the FBI and the state police and District Attorney’s Office enjoyed a close working relationship, one that established the FBI as an agent of the state prosecutor. As such, the defendant argues that the FBI’s actions are to be imputed to the state prosecutor and the state must bear the consequences of the FBI’s failure to disclose exculpatory evidence. The defendant, however, misreads that to which the Donahue Court intended its list of factors to be applied: the Court was clear that the factors existed to help determine when a state prosecutor must request from a federal agency any exculpatory material that that federal agency has in its possession. See Donahue, 396 Mass, at 597 (“Thus, the precise issue presented here is whether, in the circumstances of this case ... [a state prosecutor is] oblige[d]... to try to obtain material and exculpatory evidence in the possession of the F.B.I.”).
Donahue discusses the level of cooperation that existed between the FBI and the state prosecutors and noted that the motion judge found the cooperation to have been limited, and “(t]hus, there is no ground for imputing the F.B.I.’s knowledge or for attributing the apparent misrepresentations of the F.B.I. agent to the *605 Commonwealth.” Donahue, 396 Mass. at 600. This analysis leads to the conclusion that had there been a high level of cooperation between the FBI and the state prosecutor, then the actions of the FBI and the individual FBI agent would have been imputed to the Commonwealth. This conclusion is not only supported by the language in Donahue, but by the analysis set forth in other cases that have touched upon the issue. See, e.g., Commonwealth v. Martin, 427 Mass. 816, 823-24 (1998) (holding prosecutor had duty to disclose laboratoiy reports prepared by State Police that were not known to prosecutor and were not in prosecutor’s possession because obligation of disclosure extends to “information in possession of a person who has participated in the investigation or evaluation of the case and has reported to the prosecutor’s office concerning the case’’); Commonwealth v. Liebman, 379 Mass. 671, 675 (1980) (“... we think that cooperation between the State and Federal prosecutors is and should be common enough so that the burden of securing Federal cooperation should be placed on the State prosecutor rather than the defendant”). In short, there exists ample support for the defendant’s argument that due to the substantial level of cooperation that existed in this case between the FBI and the state police and District Attorney’s Office, the malfeasance of the federal sovereign is to be imputed to the state sovereign.
Because the FBI failed to disclose exculpatoiy material to the defendant at trial, and because that failure is imputed to the Commonwealth as a result of the federal authorities being intimately involved, both independently and jointly with various state agencies, the court finds that these actions amount to a Brady violation by the District Attorney’s Office that is only remedied by the granting of a new trial to the defendant. Because the Court finds a Brady violation occurred, it most certainly is the case that “it appears that justice may not have been done,” and therefore a new trial is required. Mass.RCrim.R 30(b).
In the alternative, even if this court did not find that the actions of the FBI should be imputed to the Commonwealth, the court concludes that the FBI laboratoiy reports are newly discovered evidence that, in any event, would require this court to allow the defendant’s motion for new trial. When a defendant brings a motion for a new trial on the ground of newly discovered evidence, the defendant must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction. Commonwealth v. Grace, 397 Mass. 303, 305 (1986). Not only must the new evidence be material, but it must also “carry a measure of strength in support of the defendant’s position.” Id.
As to the first prong of the new evidence standard, the facts clearly establish that the FBI laboratoiy reports are newly discovered. Although these reports existed at the time of the defendant’s trial, indeed they existed for some time before the defendant’s trial commenced, the reports were not available to the defendant, nor were they available to anyone outside of the FBI, until the defendant’s Freedom of Information Act request brought to light the existence of these reports in 1999 and 2000. Regarding the second element that the defendant must satisfy to obtain a new trial on the ground of newly discovered evidence, the facts affirmatively establish that this newly discovered evidence casts “real doubt on the justice of the conviction” and “carry a measure of strength in support of the defendant’s position.” See Grace, 397 Mass. at 305. Without being able to say with certainty what effect this evidence would have had on the juiy, it is quite reasonable to presume that the evidence would have cast doubt on the strength of the Commonwealth’s case as it related to voice identification (a major component of the case against the defendant) and would have supported the defendant’s argument that his was not the voice recorded from the ransom telephone calls. As such, the FBI Laboratoiy reports are also properly classified as newly discovered evidence, allowing the defendant multiple grounds on which to claim that a new trial is required pursuant to R. 30(b).
II. THE EVIDENCE RELATING TO VOICE IDENTIFICATION
The second argument posited by the defendant is that the opinion testimony related to voice identification, based in part on a visual analysis of voice spectrograms, was improperly admitted by the trial judge. The defendant advances this argument on the ground that, subsequent to his conviction, a report authored by the National Research Council (“NRC”) on voice identification techniques concluded that there is insufficient scientific evidence to support the conclusion that voice spectrogram analysis is a reliable forensic method for voice identification. The defendant argues that this revelation renders the scientific evidence relating to voice identification inadmissible under both the Fatalo and the Lanigan standards of admissibility. Additionally, the defendant maintains that the Fatalo standard of admissibility should be applied to determine whether this evidence is admissible, but argues that under either test, the evidence is inadmissible.
The Commonwealth, however, argues that the trial court properly applied the Fatalo test to adjudge the admissibility of the evidence relating to voice identification, and properly concluded that the evidence was admissible.[6] Further, the Commonwealth claims that the defendant misreads the NRC report because the report does not call into question the admissibility of voice identification evidence, but instead merely suggests that courts take certain precautions in the form of explanations to a fact finder before admitting such evidence. Finally, the Commonwealth maintains that although the Lanigan test for the admissibility of scientific evidence has replaced the Fatalo test, the *606 Lanigan standard should not be applied retroactively when determining whether the scientific evidence now in question was properly admitted.
The issue of the admissibility of voice identification, based in part on a visual analysis of voice spectrograms, was in 1975 an issue of first impression in the Commonwealth. See Lykus I, 367 Mass. at 192. Prior to the defendant’s trial, the Commonwealth sent Lt. Nash of the Michigan State Police Voice Identification Unit voice exemplars[7] of the defendant’s voice reading the words of the previously recorded ransom telephone calls. Id. at 195. Using spectrograph analysis, Lt. Nash concluded that the defendant’s voice was the same as the voice on the recorded ransom telephone call. See Lykus II, 406 Mass. at 137. After an extensive voir dire hearing on the issue of admissibility of the voice identification evidence, the trial judge allowed testimony on the matter, and Lt. Nash testified as to his findings. See Lykus I, 367 Mass. at 195-96.
The standard applied by the trial judge in 1973 for determining the admissibility of scientific evidence was the standard set forth in Frye v. United States, 29 F. 1013 (D.C.Cir. 1923), and adopted in this state by Commonwealth v. Fatalo, 346 Mass. 266 (1963). Under the Fatalo standard, scientific evidence was admissible only if it was “sufficiently established to have gained general acceptance in the particular field in which it belongs.” Fatalo, 346 Mass. at 269, quoting Frye, 293 F. at 1014. Under the then-applicable test, the court was to consider whether the evidence was “supported by substantial authority establishing scientific reliability,” in order to determine the admissibility of the evidence. Fatalo, 346 Mass, at 269.[8]
The decision of the trial judge that testimony relating to voice identification was admissible was upheld by the Court in Lykus I. There, the Court fully explained the scientific methodology of spectrograph analysis, and concluded that a review of the evidence presented to the trial judge, judicial opinions relevant to voice identification from other jurisdictions, and then-available relevant scientific writings provided “convincing proof to justify admission of the evidence.” Lykus I, 367 Mass. at 204.
Subsequent to the defendant’s 1973 trial and conviction, the FBI asked the National Academy of Sciences to evaluate the use of sound spectrograms for identifying speakers from the sounds of their voices. See On the Theory and Practice of Voice Identification, p. vii (1979) (“NRC Report”). In response to the FBI’s request, the NRC appointed the Committee on Evaluation of Sound Spectrograms, a group of scientific, research, auditory, and legal scholars, to conduct research in response to the FBI’s query, and to draft a report. Id. at vii-viii. The NRC Report produced a thorough analysis of the forensic science of voice identification, and reached the general conclusion that:
The Committee concludes that the technical uncertainties concerning the present practice of voice identification are so great as to require that forensic applications be approached with great caution. The Committee takes no position for or against the forensic use of the aural-visual method of voice identification [the visual analysis of voice spectrograms], but recommends that if it is used in testimony, then the limitations of the method should be clearly and thoroughly explained to the fact finder, whether judge or jury.
NRC Report, at 2.
The NRC Report went on to specifically discuss the use of the forensic testimony of voice identification, and addressed the scientific foundation of such testimony, as well as the risks inherent with using voice identification testimony. The NRC Report noted that voice identification evidence runs the risk of being presumed “more powerful and less fallible” than such testimony actually is, and further concluded that “voicegram evidence, unlike some other kinds of technical evidence, does not at this stage of its development stand on a thorough foundation of quantitative information describing its capabilities in forensic practice.” Id. at 69. Although the NRC Report seemingly offered a negative view of the use of voice identification testimony, the Report was crystal clear on its stance on the legal procedure for admitting such testimony.
The Committee cannot make the judgment whether the cost of providing elaborate explanations is worth the benefit of admitting the evidence. Therefore, the Committee takes no position for or against admissibility; the Committee recommends only that if voicegram testimony is to be admitted in a given case, the court should be assured that the capabilities and limitations of the method will be explained thoroughly. Id.
The defendant argues that the Report’s conclusion that voice identification lacks a “thorough foundation of quantitative information” serves to undermine the reliability of voice identification evidence and proves that such evidence is not “sufficiently established to have gained general acceptance in the particular field in which it belongs.” Commonwealth v. Fatalo, 346 Mass. 266, 269 (1963).
Although not addressed by either the defendant or the Commonwealth, the only means by which this court may review the NRC Report in the context of a motion for new trial and for the purposes of determining whether the trial judge was in error when admitting testimony regarding voice identification, is if this court finds the NRC Report to be newly discovered evidence.
Therefore, as a predicate matter to the defendant’s argument that the NRC Report renders Lt. Nash’s testimony inadmissible, the court must determine whether the Report constitutes newly discovered evi *607 dence. See Commonwealth v. LeFave, 430 Mass. 169, 176-77 (1999).
As previously stated, a defendant who seeks a new trial on the ground of newly discovered evidence must prove that the evidence is both newly discovered and that it casts real doubt on the justice of the conviction. See Grace, 397 Mass. at 305. The defendant’s trial occurred in 1973 and his conviction was upheld on direct appeal in 1975, while the NRC Report was not published until 1979. There is no question that the NRC Report was not available at the time of the defendant’s trial, nor could the report have been discovered through reasonable diligence. See Commonwealth v. Moore, 408 Mass. 117, 126 (1990). Additionally, the detail with which the NRC Report analyzes voice identification methodologies was not something available at the time of trial, and the Report does not serve merely to augment testimony or research that was before the trial judge. As such, the NRC Report is accurately described as newly discovered. See LeFave, 430 Mass. at 181 (holding evidence not in existence at time of trial, but that merely “would have tended to support the opinion evidence available at the time of the defendant’s trial” is not newly discovered evidence). For the court to be able to consider the Report, however, the defendant must also demonstrate that it casts real doubt on the justice of the conviction.
The NRC Report provides a comprehensive analysis of voice identification methodologies, and makes several conclusions and recommendations regarding the future use and development of voice identification techniques and testimony. Relevant to the instant motion, the NRC Report first notes that at the time of publication, voice identification was widely used, but lacked a “solid theoretical basis of answers!’ regarding voice identification’s scientific foundation. NRC Report, at 10. Regarding the then-existing scientific foundation for voice identification, the Report further concluded that voice identification science “probably fails the [Frye] test.” Id. at 42. The NRC Report also notes that, unlike other forms of scientific evidence then commonly used, voice identification science did not, in 1979, “stand on a thorough foundation of quantitative information describing its capabilities through forensic practice.” Id. at 69. The solution proposed by the NRC Report was not the elimination of voice identification testimony from courtrooms, indeed the Report, notably, is careful to take no stance on the admissibility of voice identification evidence. Id. at 69 (“Therefore, the Commission takes no position for or against admissibility”). Rather, the NRC Report recommends that voice identification testimony should be accompanied by an explanation on the limitations of voice spectrogram evidence, and that the fact-finder should be instructed as to the possibility of error that is inherent when attempting to determine whether two recorded voices match to the same voice. Id. at 68-69. Thus, it is not accurate to describe the NRC Report as repudiating the use of voice identification testimony. Rather, the NRC Report details for the reader the precautions that ought be taken when voice identification testimony is used at trial.
Even were this court to conclude that the NRC Report cast sufficient doubt upon the reliability of voice identification testimony, the defendant still does not succeed on his argument that the science was so unreliable or so lacking in foundation that the trial judge was in error to admit the testimony of Lt. Nash. The trial transcripts reveal that the trial judge, seemingly possessing clairvoyance, addressed and alleviated many of the concerns illustrated in the NRC Report, almost seven years before the Report was published. The trial judge conducted an extensive voir dire hearing in an attempt to understand the scientific foundation of voice identification science. The trial judge allowed the jury to hear the testimony of an expert for the Commonwealth, Dr. Tosi, who explained for the jury the methods employed in spectrograph analysis, and general background of the science. See generally Transcript XIII. Finally, and most importantly, the trial judge employed the exact precautions later set forth in the recommendation of the NRC Report when he carefully instructed the members of the jury on how they were to weigh the testimony related to voice identification. Transcript XXIV, at 2007-08; 2019-25. In short, without being aware of the NRC Report and the concerns that the Report offered regarding the use of voice identification testimony, the trial judge was independently aware of the questions stemming from voice identification methodologies and took strong measures to ensure that admitting the testimony of Lt. Nash and Dr. Tosi was the legally correct decision.
The effect of the publication of the NRC Report is negligible because it does not repudiate the use of voice identification testimony, and the concerns brought forth by the NRC Report were already addressed at trial. As such, the NRC Report cannot be said to cast doubt on the justice of the defendant’s conviction. Thus, the NRC Report does not meet the standard for newly discovered evidence and therefore will not be considered by this court as a basis for granting defendant’s motion for new trial.
III. Testimony Related to the Compositional Analysis of Bullet Lead
Through his Addendum to His Motion for Post-Conviction Relief, the defendant brings his final argument in support of his request for a new trial. The defendant challenges the trial judge’s admission of testimony related to the likelihood that the bullet fragments found in the body of the victim came from a specific box of bullets found in the defendant’s home. That testimony was based on a chemical comparison of the lead though a process known as the Compositional Analysis of Bullet Lead (“CABL”). Specifically, the rel *608 evant portion of Agent Riley’s testimony regarding bullet analysis was as follows:
Q. Do you have an opinion as to whether or not the State’s Exhibit V for identification ((a bullet from the box of bullets found in the defendant’s home)] came from the same box of shells as the Commonwealth’s Exhibit No. 4 and 5 [(the bullets recovered from the body of Paul Cavalieri)]?
A. I would think it would be a remote possibility that they came from another box of ammunition of this type-
The defendant argues that a report published by the NRC subsequent to the defendant’s trial concludes that CABL methodology is not generally accepted within the relevant scientific community. Additionally, the defendant maintains that evidence of CABL was inadmissible under the then-applicable standards governing the admission of scientific evidence as set forth in Frye. Although the defendant does not advocate for the retroactive application of the current standards governing the admissibility of scientific evidence as set forth in Daubert and Lanigan,- the defendant notes that CABL evidence would also not be admissible under the new test for admissibility.
The Commonwealth’s response to the defendant’s final argument is two-fold. First, the Commonwealth maintains that the defendant is not entitled to a new trial because he has not shown that CABL evidence casts real doubt on the justice of his conviction as required when a defendant seeks a court to consider newly discovered evidence when ruling on a defendant’s request for a new trial. Second, the Commonwealth asserts that the rules currently governing the admissibility of scientific evidence should not be retroactively applied because the defendant has failed to show that testimony related to CABL evidence meets either of the two exceptions established in Commonwealth v. Bray, 407 Mass. 296 (1990), that allow for the retroactive application of current legal standards and practices.
During the defendant’s trial, the Commonwealth introduced CABL evidence in an attempt to establish a link between the bullets found in the body of the victim and the bullets recovered from the defendant’s house. The Commonwealth presented FBI Special Agent John P. Riley who testified that he conducted a CABL analysis of the bullets found in the victim and the bullets recovered from the defendant’s house. Agent Riley’s scientific comparison of the different bullets revealed that the bullets were “similar in composition.” Transcript XIX, at 1646. Specifically, Agent Riley testified that his analysis proved the bullets to have in common seven trace elements besides lead: antimony, copper, iron, bismuth, silicone, silver, and tin. Id. at 1647. From this analysis, Agent Riley concluded that although it was possible that the bullets found in the victim’s body were different than the bullets recovered from the victim’s house, such a possibility was “remote.” Id. at 1647-48.
The evidence that the defendant now brings to the court’s attention is a report authored by the NRC which, the defendant argues, concludes that the reliability of the CABL technique is not generally accepted within the relevant scientific community. This report, entitled, Forensic Analysis: Weighing Bullet Lead Evidence (“NRC Report on CABL Evidence”), was published in 2004 by a Committee appointed by the NRC. The Report details the process by which bullets are identified through CABL methods, and makes numerous findings and recommendations. The general finding of the NRC Report on CABL evidence is that, “in many cases, CABL is a reasonably accurate way of determining whether two bullets could have come from the same compositionally indistinguishable volume of lead." NRC Report on CABL Evidence, at 109. More specifically, the NRC Report on CABL Evidence makes numerous findings on the accuracy of CABL evidence, and recommendations as to how CABL evidence might be better explained to laypersons, and to those involved in the judicial process. See Id. at 109-13
As was the case with the NRC Report regarding voice identification testimony, the court can only consider the impact of the NRC Report on CABL evidence if the Report is deemed newly discovered evidence under Commonwealth v. Grace, 397 Mass. 303, 305-06 (1986). Looking to the first of the two components of the Grace test, the defendant clearly satisfies the first prong: the NRC Report on CABL Evidence was not available at the time of the defendant’s trial, nor was it reasonably discoverable through normal efforts of counsel. As such, the NRC Report on CABL Evidence is properly considered “newly discovered.” See Grace, 397 Mass. at 305-06.
The second element that the defendant must prove, that this newly discovered evidence is material and credible and casts doubt on the justice of the defendant’s conviction, presents a more difficult question to the court. The NRC Report on CABL Evidence does not expressly repudiate CABL evidence. In fact, the Report cannot even be said to cast doubt upon the reliability of CABL evidence in general. See NRC Report on CABL Evidence, at 109 (“CABL is a reasonably accurate way of determining whether two bullets could have come from the same compositionally indistinguishable volume of lead”). What the report does do, however, is reach the finding that the “available data do not support any statement that a crime bullet came from, or is likely to have come from, a particular box of ammunition . . .” Id. at 113. The question therefore becomes whether this conclusion renders the report evidence which casts doubt on the conviction of the defendant. See Grace, 397 Mass. at 304.
The Commonwealth’s expert testified at the defendant’s trial that his analysis of the bullets found in the victim’s body and the bullets recovered from the *609 defendant’s apartment, based on CABL methodology, concluded that it was “remote” that the bullets found in the victim came from a source other than the box of bullets found in the defendant’s apartment. Transcript XIX, at 1647-48. The NRC Report on CABL Evidence directly refutes this testimony through its finding that “the available data do not support any statement that a crime bullet came from, or is likely to have come from, a particular box of ammunition.” NRC Report on CABL Evidence, at 113. The FBI asked the NRC to conduct an impartial scientific assessment of the soundness of the principles underlying CABL, the optimal manner for conducting an examination with CABL, and the scientifically valid conclusions that can be reached with CABL. In particular, the FBI asked the NRC to address the following three subjects and specific questions:
Analytical method — Is the method analytically sound? What are the relative merits of the methods currently available? Is the selection of elements used as comparison parameters appropriate? Can additional information be gained by measurement of isotopic composition?
Statistics For Comparison — Are the statistical tests used to compare two samples appropriate? Can known variations in compositions introduced in manufacturing processes be used to model specimen groupings and provide improved comparison criteria?
Interpretation Issues — What are the appropriate statements that can be made to assist the requester in interpreting the results of compositional bullet lead comparison for both indistinguishable and distinguishable compositions? Can significance statements be modified to include effects of such factors as the analytical technique, manufacturing process, comparison criteria, specimen history, and legal requirements?
The Committee’s assessment of these questions and its recommendations are summarized below. Its complete recommendations are found in the body of the report and collected in Chapter 5. The full report provides clear comments on the validity of the chemical and statistical analyses utilized in CABL and on what can and cannot validly be stated in court regarding CABL evidence. It is up to prosecutors and judges to use the conclusions of this report to decide whether CABL evidence has enough value to be introduced in any specific case. Chapter 4 includes findings and recommendations about appropriate statements that can be made in laboratory reports or by expert witnesses based on the Committee’s findings on analytical methods and statistical procedures and its knowledge of the bullet manufacturing process, including tire following:

The available data do not support any statement that a crime bullet came from a particular box of ammunition. In particular, reference to “boxes" of ammunition in any form should be avoided as misleading under Federal Rule of Evidence 403.

(Emphasis supplied.)
Compositional analysis of bullet lead data alone does not permit any definitive statement concerning the date of bullet manufacture. Detailed patterns of the distribution of ammunition are unknown, and as a result, experts should not testify as to the probability that the crime scene bullet came from the defendant. Geographic distribution data on bullets and ammunition are needed before such testimony can be given.
(Executive Summary attached.)
Although the Commonwealth is correct in its statement that newly discovered evidence that tends to negate the justice of a conviction might nevertheless be ignored by a court when the strength of the case against the defendant is so overwhelming that any new evidence is weakened, such a caveat is not applicable in the instant case. See Commonwealth v. Dascalakis, 246 Mass. 12, 33 (1923). The evidence against the defendant at trial was very strong, however, the court cannot now say that because there was sufficient evidence of guilt against the defendant that the newly discovered NRC report on CABL evidence should be given less weight.
The NRC report on CABL evidence, if available to the jury at the time of the defendant’s trial, almost certainly would “probably have been a real factor in the jury’s deliberations.” Commonwealth v. Moore, 408 Mass. 117, 126 (1990) (internal citations omitted). As such, the NRC report on CABL evidence is properly considered new evidence and requires this court to grant the defendant’s motion for new trial.
The facts referenced in this decision were derived from the record. The Appellate Division of the Superior Court of New Jersey also determined that the recent studies regarding CABL constituted newly discovered evidence which required allowance of a motion for a new trial in a murder case. New Jersey v. Behn, 868 A.2d 329, 345 (N.J. Super. 2005). The record in that case contained detailed and conclusive evidence which clearly demonstrated that the factual basis for opinions based on CABL analysis was either seriously flawed or nonexistent.
In the Behn trial, the prosecution produced an FBI CABL expert who opined that bullets found in the decedent’s body and those in the possession of the defendant “came from the same box or boxes and were packaged on the same date by the manufacturer.” Behn, 868 A.2d at 335. In the post-conviction petition, the defendant presented the affidavit of a Ph.D. scientist at the nuclear weapons laboratory in California. The scientist had begun to investigate CABL analysis at the request of the retired Chief Metallurgist of the FBI. The nuclear scientist concluded that a number of assumptions upon which CABL analysis is based were *610 false. Id. at 336. “Furthermore, Dr. Randich has found examples of bullets having the same composition despite being produced more than ten years apart.” Id. at 337. A university statistician concluded that the FBI “did not have sufficient data to determine the likelihood that the bullets having the same composition came from the same source of lead.” Id.
The Behn decision recites the exhaustive investigation made by Dr. Randich, the nuclear scientist. With respect to the assumptions underlying CABL analysis, Dr. Randich concluded “(m]y metallurgical data clearly show, as is well known in the metallurgy community, that these are not valid assumptions.” Id. at 338.
The conclusions of Dr. Randich were supported by the retired Chief Metallurgist of the FBI.
During the research of my colleagues and I ... of the practice of CABL, we found no meaningful or comprehensive studies validating inferences rendered by bullet lead examiners in criminal trials relating to “same melt,” “same box’ “same source,” or other conclusions as to common origins regarding allegedly analytically indistinguishable bullet lead.
Id, at 340.
In his affidavit, the retired FBI metallurgist also affirmed that it was not until late 2002 that it was known that there was no valid database of bullet composition. Id.
In summary, with respect to the voice identification evidence, the FBI had in its possession laboratory reports of its own technicians that “it was not possible to definitively determine whether the unknown voice was that of Lykus.” The FBI specifically directed its agents not to provide that information to the District Attorney. With respect to the bullet analysis, the National Research Council has concluded that there is no scientific basis for the testimony of the FBI agent that it was a “remote” possibility that the bullet found in the victim came from a source other than the box of bullets found in the defendant’s apartment. That the improper evidence was produced by present or former FBI agents placed an additional imprimatur on it.
ORDER
It is therefore ORDERED that the defendant’s Motion for Post-Conviction Relief pursuant to Mass.R.Crim.P. 30(b) is ALLOWED. The court ORDERS that the defendant’s conviction be vacated and that there be a new trial.

 Specifically, the relevant portion of Agent Riley’s testimony regarding bullet analysis was as follows:
Q: Do you have an opinion as to whether or not the State’s Exhibit V for identification [a bullet from the box of bullets found in the defendant’s home] came from the same box of shells as the Commonwealth’s Exhibit No. 4 and 5 [the bullets recovered from the body of Paul CavalieriJ?
A: I would think it would be a remote possibility that they came from another box of ammunition of this type.
Transcript XIX, at 1647-48.

 Prior to Lt. Nash testifying, the trial judge conducted an extensive voir dire hearing regarding the admissibility of voice spectrogram analysis. During this voir dire examination, the Commonwealth presented Lt. Nash and Dr. Oscar Tosi, professor at Michigan State University and director of the Speech and Hearing Research Laboratory, who maintained that voice spectrogram analysis was an accepted scientific method of analysis and should be admissible. Ultimately the trial judge ruled that evidence of, and testimony relating to, voice spectrogram analysis was admissible. To counter the Commonwealth’s experts, the defendant called Dr. Louis J. Gerstman who testified that, in general, voice spectrogram analysis was unreliable and such analysis should not be used as a means of identification in a forensic situation. See Transcript VI.

 The proper term for the issue before the court is, technically, direct estoppel and not collateral estoppel or issue preclusion. Collateral estoppel (or issue preclusion) exists when a common issue arises in a subsequent action of a different claim between the parties, while direct estoppel is the nomenclature used when the issue already actually litigated and decided arises from the same indictment. See Commonwealth v. Williams, 431 Mass. 71, 74 n.4 (2000).

 See August 10, 1973 Order by McGuire, J., on Defendant’s Motion for Production of Documents and Photographs filed July 18, 1973.

 Specifically, the March 28, 1973 Memorandum from the Acting Director states: “The results of the Laboratory voice-print examination, contained in a report REDACTED to you 12/7/72, are to be used for the investigative guidance of the Boston Office only as specified in The REDACTED. Since no testimony will be provided by Bureau voiceprint experts, no purpose would be served in making this report available to the District Attorney’s Office. It is, therefore, not to be included with those items to be forwarded to the District Attorney’s Office.”

 In addition to its substantive argument in opposition to the defendant’s position, the Commonwealth argues that the defendant has both already raised this argument in prior post-conviction pleadings (thereby precluding the defendant from asserting this argument again under the doctrine of claim preclusion) and has failed to make this argument in any of his post-conviction pleadings (thereby waiving his right to bring the argument). The court’s discussion of these procedural arguments is set forth in detail above, and for purposes of brevity, will not be restated here.

 Voice exemplars are defined as: “The type of test in which one’s voice is compared to the voice heard on some particular occasion. Used in trial in cases as type of scientific evidence.” Black’s Law Dictionary, Fifth Edition (1979).

 In the years following the defendant’s trial, the test for determining the admissibility of scientific evidence changed when the Court in Commonwealth v. Lanigan, 419 Mass. 15 (1994), adopted, in part, the standard enunciated in Daubed v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The Lanigan Court held that “a proponent of scientific opinion evidence may demonstrate the reliability or validity of the underlying scientific theory or process by some other means, that is, without establishing general acceptance.” Lanigan, 419 Mass. at 28. Following Lanigan, “a party seeking to introduce scientific evidence may lay a foundation either by showing that the underlying scientific theory is generally accepted within the relevant scientific community, or by showing that the theory is reliable or valid through other means.” In re Ready, 63 Mass.App.Ct. 171, 174-75 (2005) (internal citations omitted).